# Richmond

VIRGINIA ELECTRIC AND POWER COMPANY V.
C. M. BLUNT'S ADMINISTRATOR.

March 24, 1932.

Present, Campbell, C. J., and Holt, Epes, Gregory and Chinn, JJ.

The opinion states the case.

*T. Justin Moore* and *Archibald G. Robertson,* for the plaintiff in error.

*David Meade White, George B. White* and *Andrew J. Ellis,* for the defendant in error.

GREGORY, J., delivered the opinion of the court.

C. M. Blunt was killed by one of the street cars of the Virginia Electric and Power Company, and his administrator instituted this action to recover damages for the wrongful death of the deceased. A verdict in his favor was rendered by a jury, and approved by the trial court.

Blunt, at the time he met his death, was a resident of the western section of the city of Richmond. He was in good health and fifty-five years of age. He was employed by the Southern Railway Company in its South Richmond shops, and had worked for the railway company for twelve years prior to his death. He was working at this time on a shift from three-thirty o'clock in the afternoon until eleven-thirty at night. On July 9, 1929, after finishing his work at eleven-thirty that night, he boarded a street car about eleven-fifty

P. M. About twelve-ten A. M., on the same night, he was killed at·the intersection of Broad and Seventh streets by a small one-man street car, which was moving east at a slow speed. After he was struck by the car, he was dragged a distance of approximately fifty-two feet and his body was firmly caught and held by the underhang of the car. Broad street, where Blunt met his death, runs east and west and in its center the Virginia Electric and Power Company maintains a double street car track. The south track is used for east-bound street cars and the north track for west-bound cars. Immediately adjoining the north track on which west-bound cars move at the intersection and immediately east of Seventh street, is a safety zone for the use of persons who desire to board a west-bound car. From the southeast corner of Broad and Seventh street are two white lines which run parallel across Broad street and between these lines pedestrians are directed to walk if they desire to cross Broad street at this point. These lines are described by some of the witnesses as a safety zone. Blunt was struck by an east-bound car at or near the eastern white line. Seventh street is also occupied by a double track street car line and it runs approximately north and south. There was no traffic officer on duty at the crossing and there is no evidence that any traffic light was in use at the time Blunt was struck by the car. The east-bound car was standing on Broad street just west of Seventh to permit south-bound traffic to pass on Seventh street and a north-bound street car to pass on the same street. Along the south side of this car while it was waiting for the Seventh street traffic to pass was standing an automobile for the same purpose. When the traffic going south and north on Seventh street had cleared, the east-bound car and the automobile started to cross Seventh street. The street car was moving slowly and the automobile was also moving slowly. In the automobile, which was being driven by one Lee, was M. E. Bebout, who testified as follows:

"As we got to Seventh and Broad the street car was coming east on Broad, had stopped at Seventh and Broad. We stopped to let an automobile go south. It was two fellows standing on the south side of Broad street on the corner and a man about two feet from the curb in the safety zone going north on Broad. As the Forest Hill car went across, that car going east started up and we started up right behind it; and just as we got beside it two ladies were on the street car; one of them hollowed and asked us to take them home. As she hollowed the motorman looked back, and the next thing somebody started hollowing: 'There is a man underneath the street car'! We stopped at the curb and went back. At that time it was three other fellows there, and this man was underneath the street car, and we helped get him up." Again he stated that:

"After the street car went north, the east-bound street car then started, and then Mr. Lee started, and just as we got in the car tracks, at the car tracks, one of the ladies hollowed at us. About that time the motorman looked back. As we got across somebody started hollowing 'there is a man underneath the street car!' We pulled up to the curb and stopped."

He further testified that the motorman did not ring a bell or sound a gong; that the street car was moving slowly; that he saw the motorman look back and in a very short time thereafter someone hollowed that a man was under the car.

Charles Banks, an eye-witness to the tragedy, gave this account of how it happened: "I was coming from the Sanitary Restaurant with my coffee. It was after twelve o'clock. I was coming diagonally across the street, diagonally across Seventh street. Just as I got up on the curb stone on the opposite side of the street, I seen a street car and this man. The man looked like he was trying to come over to the safety to catch a car on the opposite track, and he got

about two or three feet from the safety zone to the middle of the track when the car struck him."

He further testified that the car had crossed the rail (Seventh street line) "when I saw the car bearing down on the man;" that at that time the car was about ten feet from the man; that the car had reached the Seventh street tracks before Blunt went upon the east bound track on Broad street; that Blunt had reached the middle of the track when he was struck; that the car was moving slowly; that the lights were burning in the car and the headlight was burning and that cars in crossing the intersection make considerable noise.

The defendant in error introduced in evidence section 63 (a) of an ordinance, approved July 16, 1926, entitled "an ordinance to amend and re-ordain chapter 40 of the Richmond City Code of 1924," as follows:

"Roadbeds or highways are primarily intended for vehicles, but pedestrians have the right to cross them in safety, and drivers of street cars and vehicles shall exercise proper care not to interfere with such persons or injure them or their property."

The defendant in error also offered in evidence section 5 of an ordinance, approved February 7, 1928, entitled "an ordinance to amend and re-ordain chapter 43 of the Richmond City Code of 1924" which is as follows:

"No street car shall incommode crossings or stop at crossings on any street or elsewhere to solicit passengers. It shall be the duty of the motorman of the cars to give reasonable notice to drivers of vehicles and pedestrians of their approach, also to afford a reasonable opportunity for them or either of them to avoid collision or accident." .

Code, section 2145, paragraph 73 (a) provides that: "The roadbeds of highways within cities and towns are primarily intended for vehicles, but pedestrians have the right to cross them in safety, and drivers of street cars and vehicles

shall exercise proper care not to interfere with such rights nor to injure them or their property."

And (b) "When crossing highways or streets within incorporated towns or cities, pedestrians shall not carelessly or maliciously interfere with the orderly passage of vehicles and shall cross wherever possible only at intersections or crosswalks. Pedestrians in crossing any street at intersection with another street, shall at all times have the right of way over vehicles making right turns into street being crossed by such pedestrians."

And (c) "At such intersection where no traffic officer is on duty, pedestrians shall have the right of way over vehicles."

And (d) "This shall not entitle the pedestrians to enter or cross the intersection regardless of approaching traffic, but shall be interpreted to require vehicles to change their course, slow down, or come to a complete stop if necessary to permit pedestrians to safely and expeditiously negotiate the crossing."

And (e) "Pedestrian shall cross only at right angles, and shall not cross highways diagonally; nor, except to board a street car, or to enter a safety zone at right angles, shall they step into that portion of the highway open to moving traffic, at any point between intersections where their presence would be obscured from the vision of approaching drivers by a vehicle or other obstruction at the curb or side."

After the completion of the evidence for the defendant in error (the plaintiff below), counsel for the Virginia Electric and Power Company moved to strike the evidence upon the grounds that it was "irrelevant, inadequate and inadmissible to establish any act of negligence on the part of the defendant alleged in the declaration." This motion was overruled and the jury were taken to the scene of the accident for a view of the surroundings.

The record is silent as to the various distances between

certain material points. There is no evidence as to the width of Broad or Seventh streets; nor of the space between the two white lines which are provided for pedestrians. The distance from the Seventh street car tracks to where Blunt was struck is not shown. Many other material physical points are not shown by the evidence. The jury, doubtless from their view, observed the important points and estimated the material distances.

The plaintiff in error (defendant below) refused to introduce any evidence and after numerous instructions had been given, the jury rendered its verdict in favor of the administrator for $7,500.00.

A motion was made to set aside the verdict and enter judgment for the plaintiff in error. Numerous grounds were assigned but the court overruled the motion.

In the declaration it was charged that the Virginia Electric and Power Company failed to keep a vigilant watch for persons crossing Broad street at its intersection with Seventh street; that it did not give such persons reasonable notice of the approach of its car and did not afford them a reasonable opportunity to avoid being killed or injured; and that the decedent lost his life by the negligence of the said company.

The record presents twelve assignments of error. The last eight of them involve instructions given and refused by the court.

The first assignment is that no negligence of the plaintiff in error which approximately caused or efficiently contributed to cause the death of the deceased was shown by the evidence, and therefore the verdict of the jury and the judgment entered thereon are both contrary to the law and the evidence and without evidence to support them. The second assignment is that the deceased met his death through his own negligence which bars a recovery by the administrator.

■■ Unless the judgment of the trial court is plainly wrong or without evidence to support it, this court has no power to set it aside. (Code, section 6363.) After a verdict has been found in favor of a plaintiff we must accept as true all of the facts favorable to the plaintiff which the evidence tends to establish. For the purpose of the first and second assignments, this court will view the case practically as on a demurrer to the evidence by the plaintiff in error.

■ The uncontradicted evidence shows that the motorman was not keeping a proper lookout in front of his car at the intersection where the deceased had the right to cross Broad street but was looking over his right shoulder. It also shows that no bell was rung or gong sounded to give the deceased notice of the approach of the car; that he made no attempt to check the speed of the car or bring it to a stop. The evidence further shows that the motorman failed to yield the right of way to the deceased in accordance with Code, section 2145 (73) (c), which provides that at intersections where no traffic officer is on duty, pedestrians shall have the right of way over vehicles.

Code, section 2145 (1) (x), provides that "right of way," "shall mean the right of a pedestrian or vehicle to proceed uninterruptedly in a lawful manner, in preference or priority to another pedestrian or vehicle approaching in another direction." Subsection 73 (d) of section 2145 of the Code, construes the meaning of the right of way of pedestrians. It provides that the right of way of a pedestrian means that vehicles shall change their course, slow down or come to a complete stop if necessary to permit pedestrians to safely and expeditiously negotiate the crossing.

■ The excuse offered for the motorman's failure to ring the bell or sound a gong is that the car in crossing the Seventh street tracks made so much noise that if the bell had been rung or the gong sounded the deceased would not have heard it. We do not think that the noise of the

car dispensed with the necessity of sounding the gong as is required by law. It was the duty of the motorman to notify the deceased of the approach of the car. He was not justified in failing to sound the gong because of the noise.

If the car was making considerable noise in crossing the tracks, the average person, not abnormally cautious, would pay little attention to sounds usually prevailing in a busy street other than those customarily recognized and relied upon as intended for warnings. We certainly cannot say as a matter of law that the average person in the exercise of ordinary care would have heard and heeded the noise made by the car when no bell or other usual warning signal was given. The question was one for the jury.

The excuse offered for the motorman's failure to keep a proper lookout is that he was charged with the duty of protecting his passengers and when the lady on the car hollowed to the driver of the automobile requesting him to drive her home he was justified in suspending his outlook and turning his head and eyes behind him in the direction of the passenger. We do not think this is reasonable. If he desired to attend the passenger thinking she was in trouble or distress he should have first brought his car to a stop. He certainly could not have afforded the passenger any assistance while his car was still in motion.

No excuse is offered and none shown for the motorman's failure to yield the right of way to the deceased.

It must be borne in mind that this case is not controlled by those cases where a pedestrian has suddenly stepped too close in front of a fast approaching car. The facts here are that the car had been standing still just to the west of Seventh street; that it was moving slowly when it struck the deceased. It is entirely reasonable to infer from the facts proven that the unidentified man seen by Bebout two feet from the southeastern corner of Broad and

Seventh street crossing towards the north side of Broad street was the deceased; that he was crossing for the purpose of boarding the west bound car on Broad street and that he was trying to reach the safety zone provided for westbound passengers on Broad street when he was struck. The car standing still west of Seventh street gave him his opportunity to negotiate the crossing. He, having the right of way (the car moving slowly without the sound of the gong), had the right to expect that the motorman would notify him if the car was approaching dangerously near. Under the circumstances and conditions then existing he also had the right to expect the motorman to comply with the law and yield the right of way to him. He further had the right to assume that, if the speed of the car and his own movements, if continued, would bring him in contact with the car (he having no notice that the motorman was not going to respect his rights), the motorman would slackenhis speed or stop in order to avoid striking him because this was what the motorman was bound to do under the law.

If we give the right of way provisions of the statute and ordinances any meaning we are forced to conclude that the legislature and the city council in enacting such regulations intended to grant to a pedestrian at intersections a higher right, or a priority over all vehicles at the same intersection moving in a different direction. In fact so far as the legislature is concerned, as above indicated, it has expressed its intent and meaning and has expressly construed the right of way law, for it has provided that the law shall be interpreted "to require vehicles to change their course, slow down or come to a complete stop if necessary to permit pedestrians to safely and expeditiously negotiate the crossing."

We are asked to hold as a matter of law that the deceased was guilty of such negligence as barred a recovery. If we should do this, then the pedestrian's right of way at

the intersection would be meaningless and an empty fiction. It certainly is true that a pedestrian is not bound to exercise as much care at a crossing as he is required to exercise in crossing the street at places other than intersections. The term "right of way" must have some bearing upon the relative rights of the parties and on the relative care required of them. If a pedestrian must exercise the same care at the intersection as is required of him in crossing in the middle of the block in order to avoid a charge of contributory negligence when run down by a street car (the motorman sounding no warning and keeping no lookout), then he has no right of way, but enters the intersection at his own peril just as he would do in entering any part of the street other than at an intersection. If the right of way means anything at all, it certainly puts the necessity of continuous observation and avoidance of injury upon the motorman when approaching a crossing, just as the necessity of the case puts the higher degree of vigilance upon the pedestrian at places other than intersections.

Prior to the enactment of the statutory and municipal regulations affecting the question, operators of vehicles and pedestrians had equal rights in the streets and neither a pedestrian nor the operator had a priority of right over the other and the conduct of both was governed by this rule. This extended to all parts of the street, whether at a regular crossing or elsewhere thereon. The law imposed on both reciprocal duties and obligations and both were required to exercise reasonable care to avoid injury. Even then, in Virginia the driver or operator was obligated to exercise a degree of care commensurate with the danger to be avoided and at intersections this measure of care demanded increased vigilance on his part. At intersections he was required to keep a careful watch ahead to avoid injury to pedestrians. But since the enactment of the statutes and ordinances here invoked the former

general rule outlined above as to the measure of care required of both has been changed. The pedestrian, under such regulations, for his own protection, is required to exercise a greater degree of vigilance when he crosses a street between intersections. This is because the vehicle has the superior right there. On the other hand, the operator of a vehicle must exercise a greater degree of vigilance at an intersection because the pedestrian has the superior right there. While the rule of ordinary care (which is flexible) applies to both at all times, yet the measure of ordinary care which the operator of a vehicle must exercise at an intersection is greater and higher than the care a pedestrian must exercise. Likewise at places in the street other than at intersections, where a pedestrian desires to cross, the ordinary care he is required to exercise is greater and higher than that required of the operator or driver of a vehicle. If this were not true, it would be useless to have the statutes and ordinances. Cases would be governed by the rule of the common law. Modern traffic conditions required a change in the common-law rule, hence the statutes and ordinances were enacted to accomplish that purpose. We, of course, do not mean that at street intersections a pedestrian can abandon all care and recklessly step too close in front of a moving vehicle simply because he has the right of way nor do we mean that the operator of a vehicle can recklessly and without proper care run down a pedestrian in the street between intersections.

Counsel for plaintiff in error has cited practically every negligence case which has been decided by this court in recent times but we find no similarity between the facts in those cases and the facts in the case under consideration. We have found no Virginia case which has dealt with such facts as we have here.

■ Under subsection 73 (a) of section 2145 of the Code, street cars are placed upon the same plane as other vehicles

and the regulation as to the right of way of a pedestrian at an intersection applies not only to automobiles and other vehicles but also to street cars, "* * * and drivers of *street cars* and vehicles shall exercise proper care not to interfere with such rights nor to injure them or their property."

Under the ordinances of the city of Richmond which have been previously set forth street cars are also embraced therein. It therefore appears that automobiles and street cars alike are required under the regulation to yield the right of way to pedestrians who may cross the street at an intersection.

It is said (1 Blashfield's Cyclopedia of Automobile Law, section 9, pages 291, 292, and 293):

"At crossings, all drivers, particularly of motor vehicles, must be vigilant in looking for traffic on the intersecting street and maintain such control that on the shortest possible notice they can stop their cars so as to prevent danger to pedestrians. The fact that on a bright day the driver of an automobile approaching a crossing does not see a pedestrian crossing the street, and who is in plain sight from the time of his leaving the curb until the driver is within eight feet of the pedestrian, tends to show lack of watchfulness on his part. * * *

"Under some ordinances a pedestrian is expressly given the right of way at street intersections, and, although it may be difficult to lay down any fixed rule showing just what rights and privileges this right of way may give pedestrians or take from the drivers of automobiles, it at least puts the necessity of continuous observation on the driver of the automobile when approaching the crossing. And a motorist who runs down a pedestrian passing along a street at a crossing where the latter has the right of way, with sufficient light to be seen by proper observation, is *prima facie* negligent, although he does not see the pedestrian."

Section 11, page 294, of the same work, reads as follows: "The duty of a motorist to look out for pedestrians applies, not only to those who are vigilant in observing traffic conditions, but also to pedestrians who may fail to observe every approaching car."

It is said in Berry on Automobiles (6th ed.) 357: "An ordinance giving pedestrians the right of way over crossings at street intersections in no wise impairs the duty of pedestrians to exercise ordinary care to avoid collisions with vehicles. It means no more than that when two or more persons moving in different directions approach a crossing at the same time or in such manner that if both or all continue their respective courses there is danger of collision, then the one having the preference is entitled to the first use of such crossing, and it is the duty of others to give him reasonable opportunity to do so."

In Cyclopedia of Automobile Law by Huddy, 9th ed. volume 5–6, pages 30–31, it is said:

"Positive regulations may affect the duty of the automobilist at street crossings, such as limitations as to speed or requirements as to signals or warning; or regulations may give the pedestrian the right of way at street crossings. If, owing to the different methods of locomotion and travel, the law recognizes a right of precedence in the use of a crossing, it does not mean that the persons having such right may loiter upon or obstruct the crossings to the exclusion of others or to the interruption of street traffic, but rather that, when two or more persons moving in different directions approach a crossing at the same time or in such manner that if both or all continue their respective courses there is danger of collision, then the one having the preference is entitled to the first use of such crossing, and it is the duty of others to give him reasonable opportunity to do so.  *  *  *"

In *Ashby* v. *Va. Railway & Power Co.*, 138 Va. 310, 122

S. E. 104, relied upon by the plaintiff in error, the plaintiff was not crossing the street at an intersection but was attempting to cross at a point thirty feet from the intersection when she was killed. The ordinances there invoked were not the same as the ordinances and statutes here insisted upon. Another significant circumstance in that case was that Mrs. Ashby, the plaintiff, paused and hesitated before she stepped upon the track and this indicated to the motorman that she was going to remain in safety until the street car passed.

*Gordon* v. *Va. Electric & Power Co.*, 150 Va. 442, 143 S. E. 681, 683, is another case relied upon by the plaintiff in error. The court held that under the facts in that case the lower court properly excluded an instruction which would have told the jury "that at street intersections pedestrians have the right of way over vehicles." It was held that the instruction was correct as an abstract proposition of law but in its unqualified form it could only have confused the jury; that it was not applicable in that case under the facts because it was perfectly plain that the plaintiff was guilty of contributory negligence as a matter of law; and that the only proper verdict the jury could have rendered under the evidence it did render in favor of the defendant.

Our conclusion is that the question of the negligence of the plaintiff in error was a question for the jury and not a matter of law for the court. The jury, from the evidence and under the instructions, by their verdict could rightly have found that the motorman's failure to give the deceased any warning, or his failure to keep a proper lookout, or to yield to him the right of way, was the proximate cause of the death of the deceased. We cannot, as a matter of law, from the evidence hold that the deceased was guilty of such negligence as would bar a recovery for his death.

It is next assigned as error the court's refusal to

inform the jury after the trial had begun that no grand jury investigation had been conducted concerning the accident. It developed upon the examination of the prospective jurors upon their *voir dire* that one of their number in the presence of the others said that he had been a member of the grand jury which investigated the accident involved in this case. The court excused that juror and instructed the other jurors that whatever proceeding might have taken place before the grand jury involving the accident had nothing to do with this case and further that they were to try the case upon the evidence and the instructions to be given by the court. The court then proceeded to select the jury from the prospective jurors present. During the trial of the case information came to counsel for the plaintiff in error that no grand jury investigation had been conducted respecting the accident here involved and when he received this information he requested the court to tell the jury that no grand jury investigation had been conducted but the court refused the request. This action of the court is the basis of the present assignment. The court rightly took the position in refusing the request that further instruction to the jury about the grand jury investigation would unduly emphasize the matter.

We are of the opinion that the action of the court in this regard was entirely proper and that there is no merit in the assignment.

It is next assigned as error the court's refusal to sustain the motion of the plaintiff in error to strike the evidence of the defendant in error on the ground that it was insufficient. This feature of the case has been discussed, and we deem it unnecessary to say more other than to approve the court's action in this respect.

Assignments of error numbers 5 and 6, regarding instructions 2 and 3, present questions which have likewise been discussed.

Assignment number 7 questions the right to

invoke the doctrine of the last clear chance. The question is presented by exceptions to instructions 4, 5 and J, granted on behalf of the defendant in error. The main contention on this point is that there was no evidence to support the instructions. The doctrine necessarily presupposes that a plaintiff was in a state of negligence before it can have any application. There being an entire absence in the record of any evidence of any negligence on the part of the deceased, we are of opinion that the trial court committed error in granting the instructions complained of, based on the doctrine of the last clear chance. However, we think that the trial court did not thereby commit reversible error because, as we have before stated, the negligence of the plaintiff in error in failing to keep a proper lookout, and the motorman's failure to sound the gong and to yield to the deceased the right of way were the proximate cause of the death of the deceased, and therefore, under the evidence in this case, the jury has rendered the only proper verdict it could have rendered.

Assignments of error numbers 8, 9 and 10 bring in question matters which we have already disposed of adversely to the plaintiff in error.

Assignments of error numbers 11 and 12 question the court's ruling in refusing instructions E, S, K, L and U.

Instruction E was an attempt to apply the sudden emergency doctrine to the motorman, and it was properly refused because if he was placed in a position where he was not required to act as a man of ordinary prudence would have acted, he placed himself in that position by failing to look out for and yield the right of way to the deceased. He was not proceeding across the intersection as the law required him to proceed. This also applies to instruction S which is similar to instruction E. Another valid reason for refusing these instructions is that the motorman was never placed in an emergency prior to the time his car struck Blunt. There was no evidence that he ever saw

Blunt before he was struck. In fact it is strongly intimated and could reasonably be inferred from the evidence that the first time the motorman saw Blunt was when he was taken from beneath the car. So there was no evidence upon which to base such instructions.

█ Instruction K would have told the jury that if Blunt was in a place of safety but negligently failed to remain there his administrator could not recover. In view of what has already been stated it is clear that this instruction was properly refused. However, this point was covered by another instruction which was given.

█ Instruction L would have told the jury that the car tracks were a declaration of danger and if Blunt negligently stepped upon the track in front of the approaching car too close for the car to be stopped by the operator in the exercise of ordinary care then they should find for the defendant. The court properly refused this instruction because there was no evidence that Blunt negligently stepped upon the track.

Instruction U attempted to define the relative duties of Blunt and the operator of the car. This was refused because the court in instruction H had already defined their duties.

Twenty-one instructions were granted and given the jury; eight at the request of the defendant in error and thirteen at the request of the plaintiff in error. They covered every legal aspect and theory of the case. The plaintiff in error had its opportunity to enlighten the jury as to how and why the deceased met his death. It elected to offer no testimony in explanation of the accident though its motorman who operated the car which killed Blunt was present in court and could, in all probability, have shed some light upon the matter.

The judgment of the trial court is affirmed.

*Affirmed.*

Epes, J., dissenting.