## Richmond

### THE CHESAPEAKE AND OHIO RAILWAY COMPANY, A CORPORATION v. EUNICE J. MARSHALL, ADM'X, ETC.

June 20, 1949.

Record No. 3493.

Present, All the Justices.

The opinion states the case.

*Leake & Spicer*, for the plaintiff in error.

*William Massie Smith* and *Perkins, Battle & Minor*, for the defendant in error.

HUDGINS, C. J., delivered the opinion of the court.

Thomas G. Marshall, a furniture salesman, thirty-five years of age, died as a result of injuries received when struck by a shifting yard engine, owned and operated by the Chesapeake & Ohio Railway Company, immediately after he jumped out of a freight doorway of the M. C. Thomas Furniture Company, situated south of defendant's passenger station in the city of Charlottesville. The administrator brought this action for wrongful death of decedent and recovered a verdict for $15,000. Judgment was entered on the verdict, which is now before us for review.

The dominant question presented is whether the evidence is sufficient to sustain the verdict of the jury.

The main-line tracks and terminal yard of defendant extend approximately east and west through the city of Charlottesville. The station is to the north of the tracks. There is a long passenger platform that extends beyond the sides of the building and south to the southern rail of the east-bound track. There are two short sidetracks south of and running parallel with the double mainline tracks. There are no floors laid between the rails of the sidetracks; hence the tops of the rails are at least 4 inches higher than the level of the ground. The rails of the fourth or the extreme southern track are connected with the main-line rails by a switch west of the platform. The eastern terminal of this track is a bumper which is built in the track at a point a few feet beyond the east side of the station. This is known as the "short" track and is used as a siding for idle cars and delivery of freight shipments.

On the south side of the tracks opposite the passenger platform, are four privately owned warehouses, the walls of which extend along the southern boundary of defendant's right of way. Each of these warehouses has two doorways approximately three feet from the ground and on a level with the floors of freight cars through which incoming and outgoing freight is loaded. The doorways are closed with

sliding doors which are opened and closed from the inside, with no outside steps leading up to them.

The first building to the east is the "Stop and Shop" warehouse. The second building is owned by M. C. Thomas Furniture Company, the walls of which are only 3.65 feet from the nearest rail of the "short" track. East of the "Stop and Shop" warehouse is the dead end of 6th street across which is a woven wire fence 6 feet high, extending on the southern boundary of the railroad from the "Stop and Shop" warehouse 43 feet. From the eastern terminus of this woven wire fence a high barbed wire fence extends south 20 feet; thence east 153 feet to a point opposite the bumper.

The regular entrance for employees and customers of the Thomas Furniture Company building is on 6th street, where steps lead to a platform and entrance into the "Stop and Shop" warehouse. From this entrance an aisle extends through the building to the Thomas Furniture Company warehouse. On the east side of the "Stop and Shop" warehouse there is a small gate in the woven wire fence through which pedestrians sometimes pass. It is usually locked, the key being kept by the station master. There are two safe ways of crossing defendant's right of way, one is an underpass west of the warehouses and the other is an overhead crossing east of the station.

At approximately 8:30 a. m. on March 5, 1946, Marshall took two customers, Mrs. Peterson and Mrs. Black, in the Thomas warehouse to show them furniture which was stored therein. Instead of using the regular entrance to the warehouse the parties used defendant's right of way, crossing over the four tracks, including the two southern tracks between the rails of which there were no floors. Marshall asked employees of defendant for the key to open the gate leading through the woven wire fence, but was told the key was not available. Thereupon Marshall climbed over the fence, entered the furniture warehouse through the regular entrance, and opened the sliding door to No. 2 freight doorway through which the two women entered.

The parties remained in the warehouse from twenty to twenty-five minutes and started to leave the building through the same door they had entered. Marshall, without looking or listening for an approaching train, jumped from the door to the ground. He assisted Mrs. Black in getting out of the door, turned, faced the door with his left side toward the east for the purpose of assisting Mrs. Peterson. As Mrs. Black's feet touched the ground she saw the front of an engine approaching approximately 20 feet away. She screamed and stepped back towards the wall and at the same moment Marshall was struck by the projecting parts of the engine and Mrs. Black was knocked off her feet, but as she was falling she was caught and pulled into the doorway by Robert L. Desper who was standing therein. Marshall died the next day, March 6, from injuries received.

A few moments before the accident defendant's yard engine No. 224, operated by E. A. Sandridge, engineer, had backed east on the "short" track by the warehouses and had picked up an express car which was standing at the eastern terminus of the "short" track. Marshall, while standing between the rail and the doorway, was struck by projecting parts of the engine as it was moving westwardly at approximately 4 miles per hour.

Plaintiff concedes that Marshall was guilty of negligence, but contends that notwithstanding his negligence, she is entitled to recover under the doctrine of the last clear chance. We do not think the evidence was sufficient to submit the case to the jury under this doctrine.

Plaintiff also contends that decedent was a licensee to whom defendant owed the duty of lookout. Defendant contends that decedent was a trespasser to whom defendant owed no such duty. We do not deem it necessary to decide this question, and in the following discussion will assume that decedent was a licensee.

After the engine and tender had passed the doorway going in an easterly direction and had been coupled to the express car, the front of the engine was 137 to 139 feet from the

doorway. The engineer stated that as he reversed the movement of the engine and started west he was looking forward "right through the front clear vision glass." He did not see anybody in the tracks, "there wasn't anybody in sight to see." He could not have seen the doorway as the top of the engine obstructed his view. He also said that he could not see a person standing between the rails closer than 60 to 70 feet of the engine because the running board and other projections prevented. F. E. Lawrence, assistant road foreman of engineers for defendant, stated that after the accident he sat in the cab in the operating position of the engineer on this engine, and ascertained by actual measurement that the running board, the boiler and other gadgets totally obstructed his view of a person standing in the center of the tracks closer than 146 feet of the front of the engine. If we accept the estimated distance of Sandridge rather than the measured distance of Lawrence, Sandridge could not have seen decedent if he were in the middle of the tracks within 60 to 70 feet. Whether decedent was standing between the rails immediately before the accident is doubtful. The testimony on this point will be discussed below. However, it does not appear that the engineer could have seen decedent when decedent, without looking, suddenly jumped from a place of safety to a perilous position, in front of the engine approaching with its bell ringing.

Plaintiff's main contention is that the testimony of Gordon Mays, conductor of the crew of the shifting train, is sufficient to sustain the verdict of the jury on the question of whether defendant had a last clear chance to avoid striking decedent.

Mays testified that when the engine started east from the switch to get the express car he was at the western end of the track, but was not paying any attention to the engine. After the tender of the engine had been coupled to the express car and the train started forward he looked around and saw two people "standing in the track." He "hollered for them to get back or to watch," and at the same time

gave "the stop signal." When he realized that the people standing on or near the track would not heed his warning, he began running towards them, holloing to decedent and continued to give the stop signal.

Mays was standing at a point 20 feet north of the switch 265 feet from the No. 2 doorway when he first saw the perilous position of the persons on the track. The engineer in the cab was 60 or 70 feet farther from him and did not see the signal and did not see him, although the flagman on the eastern end of the express car testified that after the car was coupled and the engine had gone forward 25 to 30 feet he saw Mays' signal and repeated it to the engineer. However, the engineer was not looking back, but was looking forward down the track and had no reason to expect a signal from him.

There was nothing to prevent the engineer from seeing Mays if he had looked slightly to his right and more than 300 feet down the yard. There is a slight curve in the "short" track beginning near the western end of the furniture warehouse and ending at the switch. The natural focus of the eyes of the engineer, if he was keeping a reasonable lookout for obstructions or people on the track, would not necessarily be as far as 300 feet in front of him and slightly to the right of the track. The engineer was not expecting a signal from Mays, nor did Mays expect to give any signals. Under these circumstances, there was no duty on the part of the engineer to look in Mays' special direction, and his failure to do so, or to see and heed the signal, was not negligence.

The fireman testified that after the express car was coupled he turned around, faced the west, the direction in which the engine was going, started the bell to ringing, and was looking through his window in front of the cab. From this position he could not see the tracks or the space between the buildings and the track as the boiler and the running board obstructed his view. He would have seen the space and the tracks if he had put his head out of the window of

the cab, but he did not do this because he knew the walls of the building were too close to the track for him to do so with safety to himself. Just as the front of the engine neared the doorway he saw something over the running board which looked like a person. He yelled to the engineer, who at the same moment heard a scream. The engineer applied "both brakes in emergency and stopped 25 or 30 feet from the door." This was within as short a distance as it was possible to stop the engine running at the speed stated.

Mays estimated that after he had given his first signal to stop, the train moved forward approximately 70 feet before striking decedent. A train running at the rate of four miles an hour travels approximately 6 feet a second; hence decedent was struck less than twelve seconds after Mays first saw him and began signaling. If the train was running faster than this, as some of the witnesses said it was, then even less time elapsed during the interval. Mays continued to run toward the scene of the accident, and when he arrived the engineer had stopped the engine, gotten out of the cab, and was in front of the engine looking for Mays to aid in moving Marshall's body from its entanglement with the engine. This evidence tends to show how quickly decedent was struck after Mays first saw him.

Numerous cases are cited in the briefs to support the respective contentions of the parties, but in none of them is the pertinent doctrine of the last clear chance more clearly defined, and the circumstances under which it should be applied stated, than by Mr. Justice Gregory, speaking for the unanimous court, in *Hutcheson* v. *Misenheimer*, 169 Va. 511, 516, 194 S. E. 665:

"The doctrine of the last clear chance is one involving nice distinctions, often of a technical nature, and courts should be wary in extending its application. *Van Sickler* v. *Washington, etc., Ry.*, 142 Va. 857, 128 S. E. 367. 'The last clear chance implies thought, appreciation, mental direction, and the lapse of sufficient time to effectively act upon

the impulse to save another from injury.' *Barnes* v. *Ashworth*, 154 Va. 218, 153 S. E. 711, 720.

"The doctrine presupposes time for effective action. It is not applicable where the emergency is so sudden that there is no time in which to avoid the accident. Unless there is an appreciable difference in time between the earlier negligence of the plaintiff and the later negligence of the defendant and a last clear chance to avoid the accident afforded the defendant which he fails to avail himself of, the doctrine does not apply.

"The plaintiff is not entitled to recover under the doctrine upon mere peradventure. The burden is upon him to show affirmatively by a preponderance of the evidence that by the use of ordinary care after the peril was discovered the defendant in fact had a last clear chance to avoid the injury. A mere possibility is not sufficient. *Washington, etc., Ry.* v. *Thompson*, 136 Va. 597, 118 S. E. 76."

The failure of plaintiff to carry the burden of proving that defendant had sufficient time for effective action to prevent the injury after Marshall had negligently placed himself in a perilous position is shown more conclusively by the testimony of three of plaintiff's witnesses who were in or near the doorway at the time decedent was struck.

Mrs. Peterson testified that she, Mrs. Black and Desper followed Marshall to the doorway and when they got there "he (Marshall) jumped out and helped Mrs. Black out and then he turned around to help me out, about that time Mr. Desper was walking up and said Grace go ahead and jump and I said no Bob you come here and help me out." As Desper walked up Mrs. Black screamed and she (Mrs. Peterson) heard the engine. Desper "threw me back in the building, by that time the engine had hit them both and knocked Mrs. Black around and when it did that Mr. Desper caught her and pulled her in the building." "Q. Do you think in view of the experience you went through there, you could give the Jury a reasonably accurate idea as to how long Mr. Marshall was out of the building on

the track before he was hit? A. Well it couldn't have been over a minute."

Desper testified that immediately after Marshall had "helped" Mrs. Black out of the door the engine was "right on them," and that the engine struck them within a few seconds after Marshall jumped out of the warehouse. The testimony of this witness on this point is illuminating and is copied in a footnote.[1]

[1] "Q. Do you remember hearing Mrs. Peterson ask you to help her Bob, or something of the sort?

"A. Yes, Mrs. Peterson was behind me a very short distance and the rest of them was on the ground and I was just about on the edge to go out too to help her down, and Marshall had turned around to help her down, when I saw this engine I knocked Mrs. Peterson back in the door and then I caught Mrs. Black when the engine went on by and pulled her in the door.

"Q. You intended to get on the ground?

"A. I was going to get down, yes, sir, to help her down.

"Q. When did you first become conscious of the engine there?

"A. When I saw the front of it and Mrs. Black was off the ground, the engine had her off the ground, the door of the building was about that far from the engine and it just knocked her on around.

"Q. That was the first time you saw the engine?

"A. Just the front of it and then I saw her.

"Q. Could you tell how fast the engine was going?

"A. Well not too fast—a fast walk.

"Q. Did you hear any exclamation or holler from any of the engine crew?

"A. The fireman hollered when he hit Marshall, the fireman hollered to the engineer, that is the only thing I heard. * * *

"Q. How soon after he hollered did the engine stop?

"A. As far as from here to the door (estimated 20 feet) * * * he hit Marshall before the fireman hollered or just about the same time it happened just like that. (Indicating by snapping fingers) * * *

"Q. What did you do with reference to Mrs. Black, she was down on the ground, I believe?

"A. Well I caught her around the neck and pulled her back in the door as the engine was going by, the engine had her off the ground * * *

"Q. And you didn't see the engine until Mr. Marshall had been struck?

"A. I was about to step down myself, that is right.

"Q. Had you heard it up to that time?

"A. No, sir. I hadn't heard nothing, none of us heard anything."

"CROSS-EXAMINATION

"Q. Mr. Desper, what did Mr. Marshall do when he jumped to the ground?

Mrs. Black said that as the four walked to the door, Marshall was two or three feet ahead and he jumped down and held his hands out for her. She "braced on them and jumped down," and as she "hit the ground" the approaching engine was within twenty feet of her.[2]

"A. He didn't have time to do anything except threw his hands up against the wall and engine hit him.

"Q. He did turn to help Mrs. Black down, didn't he?

"A. He had already helped her then.

"Q. When he got down the first thing he did was help her down, didn't he?

"A. That is right and it was right on them like that.

"Q. And the engine was practically there?

"A. Right on them.

"Q. It was not but a few feet away when he got down on the ground?

"A. That is right.

"Q. And you were just behind the two of them weren't you and you got to be a very busy man there for a few seconds?

"A. Plenty busy.

"Q. You pulled her back with one arm and you pushed Mrs. Peterson back in the building with the other?

"A. I pushed her back I was just fixing to get down to help her down.

"Q. And Mr. Marshall had you seen him look in either direction before jumping out of the building?

"A. No.

"Q. He came straight to the door and jumped down?

"A. He just stepped down, he didn't have to jump. * *

"Q. Mr. Desper, this all happened in just a very few seconds that Mr. Marshall stepped out of the warehouse?

"A. Yes it did.

"Q. Before he was struck?

"A. Yes."

[2] "Q. Before you jumped out did you hear an engine coming?

"A. No, sir.

"Q. Did you see an engine?

"A. The time I hit the ground I did.

"Q. Do you have any idea how far it was from you?

"A. Well it was not any distance much from us, I don't know how far it was.

"Q. I imagine it frightened you right much, didn't it?

"A. Yes, sir.

"Q. What did you do?

"A. Well, I went back to the building thinking the engine would get on by without hitting us.

"Q. You say you went back to the building?

"A. I just took a couple of steps and we were right there.

Mays testified that he saw two people "in the tracks" and Mrs. Black was not certain, but said "I guess we were. I say we were in the middle of the tracks." As stated, the distance between the walls and the nearest rail was 3.65 feet; from the rail to the middle of the track is 2.35 feet—that is, the middle of the track is 6 feet from the doorway. Marshall could not have been in the middle of the track when he caught Mrs. Black by the arm to help her out of the door, nor could he have been there when he was in a position to help Mrs. Peterson down in like manner. There was no reason for him to go that far from the doorway in the very short interval between the time he jumped out and the time he turned to assist Mrs. Peterson. He was at no time visible to the men in charge of the train from the time

"Q. Were you pretty much in the middle of the tracks or where were you?
"A. I guess we were, I say we were in the middle of the tracks. * * *
"Q. You thought you could squeeze between the building and the engine?
"A. Yes, sir.
"Q. What happened to you, how did you avoid being killed?
"A. If Mr. Desper hadn't pulled me back in the building I guess I would have been."

"CROSS-EXAMINATION

"Q. * * * when you got to the door did he jump down right away, as soon as he got to the door?
"A. I believe he did, yes, sir.
"Q. And you were right behind him?
"A. Yes.
"Q. He immediately turned to help you down?
"A. That is right.
"Q. Did you see him at any time look down the track either way?
"A. I never noticed.
"Q. As soon as he helped you down he attempted to help Mrs. Peterson down?
"A. That is right.
"Q. In doing that he tried to get up near to the door?
"A. Yes, he was near the door in order to help us down.
"Q. You saw the engine the time you hit the ground is that right?
"A. Well, just about the time.
"Q. Was that about the first time he realized the engine was there?
"A. I think we realized it about the same time."

he suddenly jumped in front of the engine until he was struck.

Marshall was thoroughly familiar with the conditions in the vicinity of the accident. He knew that the space between the walls of his company's building and a passing train was too narrow to permit a person to stand therein with safety. He knew that pedestrians were not accustomed to use the doorway as an entrance to the warehouse and that trains were shifting frequently in the yard. He nevertheless very negligently jumped out of the door without either looking or listening for approaching trains. If he had taken even a slight precaution for his own safety, he would have seen the engine approaching, or if he had listened, he would have heard the noise and the bell ringing. Marshall's negligence not only continued down to the time of the accident, but was the direct, proximate cause of it.

"We have held that the duty of guarding an individual against injury, which the law imposes upon a railroad company, is no higher or greater than that which the individual owes to care for his own safety; that all men know that to be upon a railroad track along which trains are frequently moving is to be in a position of danger, and imposes upon the person so exposing himself the obligation to keep a constant lookout for his own protection." *Southern Ry. Co.* v. *Bailey,* 110 Va. 833, 836, 67 S. E. 365, 27 L. R. A. (N. S.) 379.

Even if it be conceded that defendant was negligent, the negligence of decedent continued up to the very moment he was struck and was, therefore, contemporaneous and concurrent with the negligence of defendant. The emergency created by decedent's negligence was so sudden that defendant did not discover his perilous position on the track and had no opportunity to avoid inflicting the injuries of which plaintiff complains.

Since the evidence is insufficient to support the verdict of the jury, it becomes our duty to reverse the judgment of the trial court and enter final judgment here for defendant.

*Reversed and final judgment.*

SPRATLEY, J., concurs in this opinion.

MILLER, J., concurring.

The majority and dissenting opinions are at variance in their evaluation of the evidence.

In the former, the conclusion is reached that the evidence fails to establish any negligence on the part of the engineer. If that be true, there is no base on which to rest the doctrine of last clear chance, which necessarily requires a state of facts where both plaintiff and defendant are guilty of negligence.

I agree that the evidence fails to establish negligence on the part of the engineer and concur in the majority opinion.

However, if the evidence be deemed sufficient to establish negligence on the part of defendant, I would nevertheless be constrained to agree with the result reached in the majority opinion. A state of facts would then exist where both decedent and the engineer were negligent and the negligence of both caused the accident. Each failed to keep a proper lookout, yet decedent was never in helpless peril until the moment he was struck. In stepping upon the track and remaining in that dangerous position while the slowly moving engine approached, he was negligently inattentive, but at any time before the mishap he could have readily removed himself from the zone of danger and thereby saved himself.

It is not shown that the engineer ever saw the decedent or the signal given by Conductor Mays, or that he was in any manner apprised of decedent's presence in time to stop the engine before he was struck. The doctrine cannot be applied under this set of circumstances.

Not only do I think that this conclusion is in accord with what is said in sections 479 and 480 of the Restatement of the Law of Torts and the Virginia Annotations thereto, but where the doctrine is discussed at length in 38 Am. Jur., "Negligence", sec. 224, p. 909, we find the following:

"The great weight of judicial authority denies the application of the last clear chance doctrine in the situation where the defendant, while under a duty to discover the

danger to the injured person, did not actually discover it and the injured person was physically able to escape from the peril at any time up to the moment of impact."

My view that such a negligently inattentive but not helpless party is not entitled to recover under the doctrine of last clear chance upon such a state of facts has been set forth at length in my opinion concurring in the result in *Anderson* v. *Payne, ante,* p. 712, 54 S. E. (2d) 82, this day decided.

BUCHANAN, J., concurring in result.

My conclusion is that a reversal of this case is required because the plaintiff failed to establish that the defendant's engineer, by the exercise of reasonable care, should have seen the perilous situation of plaintiff's decedent in time to avoid the accident. In other words, the evidence does not show that the defendant was negligent. If it be conceded that it was, then there was no continuing negligence of the decedent that would bar recovery. The decedent's negligence was in jumping out of the door as he did. That act of negligence put him in a situation of peril of which he was clearly unconscious. If there had been sufficient evidence to establish that the engineer should have seen him in that situation in time to save him by exercising reasonable care, then the plaintiff would have been entitled to recover. See *Anderson* v. *Payne, ante,* p. 712, 54 S. E. (2d) 82, decided today.

MR. JUSTICE EGGLESTON joins in this concurring opinion.

STAPLES, J., dissenting.

I regret that I cannot agree with the majority opinion in this case. I think there is ample evidence in the record upon which the jury could properly have based a conclusion that Sandridge, the engineer, if he had used ordinary care in keeping a lookout, either would have discovered the

decedent, Marshall, in a position of peril in time to have avoided the accident, or would have seen the stop signal given him by the yard conductor.

The following testimony of the yard conductor, Mays, who was in charge of the movement of the engine, if believed, clearly establishes the fact that after Marshall and Mrs. Black had already stepped down from the door of the warehouse, and while they were standing in the middle of the track, the engine began its movement towards them.

"Q. Where were you, Mr. Mays, as that engine went down to get that car?

"A. I was at that west end of that track.

"Q. Were you looking at the engine?

"A. I wasn't paying any attention to it.

"Q. Did you hear the engine put in reverse or whatever you call it when it coupled up the car?

"A. Yes, sir.

"Q. Did you look around at that time?

"A. Yes, sir.

"Q. When you looked around did you see anybody either getting out or in the door of the Thomas Warehouse?

"A. There were two people standing in the track.

"The Court: Standing in the track?

"A. Yes, sir.

"By Mr. Battle:

"Q. When the engine reversed?

"A. Yes, sir.

\*     \*     \*     \*     \*     \*

"Q. When the engine coupled on to the car down at the end of the track and you heard it reverse and looked around and saw those people standing in the track what did you do?

"A. *As the engine started forward,* I hollered for them to get back or to watch. I don't recall what I said, undoubtedly they didn't hear me and so then I started running toward the yard engine. (Italics supplied).

\*     \*     \*     \*     \*     \*

"Q. When you started signalling, could you tell us where the front of the engine was with reference to that wire fence down there?

"A. Well when I started signalling *he had just started out* and that would put him pretty close along the wire fence. (Italics supplied).

"Q. You say he was just starting out when you started signalling?

"A. Yes, sir. When he started I hollered for them to get back it was somewhere about the wire fence, the end of it."

The "signalling" referred to was shutoff or stop signals Mays was giving the engineer.

When the engine began its movement, the front of it was 139 feet east of the warehouse door.

The engineer, Sandridge, testified that when sitting in his cab, in the ordinary position, he could see around the front of the engine an object sixty or seventy feet ahead. If the jury believed this testimony, as we must assume it did, then if the engineer had been looking ahead at the time he started his engine he would have observed Marshall and Mrs. Black standing on the track with their attention directed to someone inside the building. If he had been looking after the engine started, he could likewise have seen them while he was traveling the first sixty-nine or seventy-nine feet in their direction. As the engine started up it was obviously traveling very slowly and had gained speed to the extent of about five miles an hour at the time Marshall was struck. The jury, therefore, would have been justified in concluding that the engineer, by the exercise of ordinary care, should have discovered Marshall in his position of peril, obviously ignorant of the oncoming engine, in ample time to have stopped it before reaching him.

While there was some conflict as to the ability of the engineer to see an object sixty or seventy feet in front of the engine, the jury took a view of the same engine and had every opportunity to test the accuracy of the testimony.

The fact that Marshall was oblivious of his peril was clear to Mays, the yard conductor, and he began, immediately after the engine started, to run towards the engine, giving stop-signal orders to the engineer as he ran. It appears therefore that, even after the engine had progressed to a point where the engineer could no longer see Marshall and Mrs. Black, he could have seen the stop-signal orders which were being given to him by Conductor Mays. This is admitted by the engineer who testified as follows:

"Q. If you had been in a position for you to see him (referring to Mays) and he had given a signal, would there be any reason why you couldn't have seen him?

"A. None whatsoever. I was sitting facing forward like I am now at the time, there was nothing to obstruct me from seeing anybody over in the track I was in or the opposite track.

"Q. You were sitting looking forward?

"A. Yes, sir.

"Q. Did you have your head out the window?

"A. No, I was looking through the front clear vision glass."

The inference from this testimony of the engineer apparently is that Mays did not give any such signal. Mays' testimony, however, is corroborated by the brakeman, William Carter, who testified that from his position on the rear of the car which was attached to the engine he saw Mays giving the signals and he himself immediately "started doing the same thing," in case the engineer should look his way. He says he saw these signals after the engine had traveled about twenty-five or thirty feet. Carter states that he was hanging from the rear of the car on the side step and that, if the engineer had been looking in the same direction that he was, there was nothing to prevent him from seeing Conductor Mays giving the signals.

Carter's statement that the engineer could have seen Conductor Mays if he had been looking was corroborated by the testimony of Mays himself, which was as follows:

"Q. How far were you from this side track, from the western end of the track, Mr. Mays? What I am getting at is this, if the engineer had been looking up the track, would you have been in his line of vision?

"A. Yes, if he had been looking toward the outlet of that track, I believe he would have seen me. Whether he was looking that way or not I don't know."

The majority opinion quotes the testimony of Desper and Mrs. Black, companions of the deceased, which would indicate that the accident occurred in a much shorter time after the decedent stepped from the door than is indicated by the testimony of Mays and Carter. I think, however, it was a question for the jury to determine which version of the accident it would accept. Desper and Mrs. Black, of course, had passed through a highly exciting and harassing experience and the jury might have regarded their memory of the time which elapsed after the decedent stepped from the door until he was struck by the engine as not dependable. As said in Moore on Facts, Vol. 2, section 867:

"There is nothing about which honest men swear so vaguely and contradictorily as the times which mark the progress of an exciting incident. * * * ."

And in section 863 to the same effect:

" * * * Excitement of the witness at the time of which he speaks will make his estimate all the more unreliable. 'When it comes down to the point of estimating duration of time by one or two minutes or the fraction of a minute, under exciting circumstances, the testimony of the average witness as to accuracy is of little value.' "

The correctness of this appraisal of the accuracy of the memory of witnesses under such circumstances is borne out by the testimony of Mrs. Peterson and Desper with reference to what happened immediately preceding the accident. Mrs. Peterson's statement on the subject is as follows:

"We followed Mr. Marshall to the freight door and when we got there he jumped out and helped Mrs. Black out and

then he turned around to help me out. About that time Mr. Desper was walking up and said Grace go ahead and jump and I said no Bob you come here and help me out.

"Q. How far was Mr. Desper from you when you said that?

"A. I would say 8 or 10 feet.

"Q. That was after Mr. Marshall had jumped?

"A. Mr. Marshall and Mrs. Black were both on the ground.

"Q. Did he come up to help you out?

"A. Yes, sir, Mr. Desper came up and he was ready to help me to the ground and at that time I heard the engine and Mr. Marshall and Mrs. Black scream and about that time Mr. Desper threw me back in the building, by that time the engine had hit them both and knocked Mrs. Black around and when it did that Mr. Desper caught her and pulled her in the building."

With respect to this same incident, Desper's testimony was quite different:

"Q. Do you remember hearing Mrs. Peterson ask you to help her Bob, or something of the sort?

"A. Yes *Mrs. Peterson was behind me* a very short distance and the rest of them was on the ground and I was just about on the edge to go out too to help her down, and Marshall had turned around to help her down. When I saw this engine I knocked Mrs. Peterson back in the door and then I caught Mrs. Black when the engine went on by and pulled her in the door."

Thus, according to the memory of Mrs. Peterson, Desper was approaching them and was a distance of 8 or 10 feet behind her, whereas, according to Desper, he was a short distance *in front* of Mrs. Peterson.

At any rate, the jury may have believed that they were indulging in a jocular discussion as to which of the two men was to have the privilege of helping Mrs. Peterson to the ground, and that a sufficient amount of time elapsed, after Marshall and Mrs. Black were standing in the track

and while Desper was coming up from the rear, to reconcile any apparent conflict as to the time element in the testimony of Conductor Mays and that of Mrs. Peterson and Desper.

But, regardless of whether or not there was an irreconcilable conflict in the testimony of these witnesses, it was within the province of the jury to resolve it and to rest its verdict solely upon the testimony of Conductor Mays and the brakeman, Carter.

As said by Mr. Justice Gregory in *Virginia Elec., etc., Co.* v. *Blunt* (1932), 158 Va. 421, 163 S. E. 329:

"Unless the judgment of the trial court is plainly wrong or without evidence to support it, this court has no power to set it aside. (Code, section 6363). After a verdict has been found in favor of a plaintiff we must accept as true all of the facts favorable to the plaintiff which the evidence tends to establish. For the purpose of the first and second assignments, this court will view the case practically as on a demurrer to the evidence by the plaintiff in error."

The rule is elementary that all conflicts in the testimony and inferences therefrom must be resolved in favor of the party who has obtained a verdict in the trial court. In *Selfe* v. *Fuller* (1942), 179 Va. 30, 18 S. E. (2d) 254, the statement of the rule contained in one of our earlier decisions was quoted with approval in the opinion of Mr. Chief Justice Campbell:

"It should be unnecessary to say what we have so frequently said before, that when a litigant comes before this court with the favor of a verdict of the jury approved by the trial court he occupies the strongest position known to the law, and that, in such cases, the facts should be stated and accepted in the light most favorable to him."

The evidence shows that the track on which the accident occurred was a sidetrack intended primarily to provide unloading facilities from freight cars to the warehouses adjoining it. It was a dead-end sidetrack extending only a short distance beyond these warehouses. Not being used

for current railroad traffic, the jury may have inferred that it was so highly improbable that a train would be traveling on this track that the enginemen should have anticipated that persons walking or standing thereon would not be diligent to observe a careful lookout for a possible approaching train. It is a matter of common knowledge that it is customary for property owners to bear the cost of installing sidetrack facilities. There is no evidence to show that the decedent did not look for an approaching train before or immediately after he jumped from the warehouse door. If he did look, what he saw, according to the testimony of Conductor Mays, was an engine standing still.

Moreover, not one of the three companions of the decedent heard any engine bell ringing, and the jury would have been justified in concluding, as a matter of fact, that it did not ring. Under these circumstances, I believe it cannot be said, as a matter of law, that there was any negligence on the part of the decedent even if he looked and saw the standing engine.

However, even if such negligence could be imputed to him, there is ample evidence to support a finding of the jury that the negligence of the engineer in failing to keep a lookout ahead was the sole proximate cause of the accident. It is well-established by the numerous decisions of this court that, if the engineer saw or by the exercise of ordinary care could have seen the decedent's situation of peril in time to avoid the accident, he will be deemed to have had the last clear chance to avoid the accident. In such a case, the negligence of the decedent, if any, is to be regarded in law as a remote and not a proximate cause. In *Yellow Cab Corp.* v. *Henderson* (1941), 178 Va. 207, 215, 16 S. E. (2d) 389, in an opinion delivered by Mr. Justice Spratley, the following is said:

"The doctrine, we think, has nowhere been better stated than by Mr. Justice Holt, in the very recent case of *Joynes* v. *Coard*, 175 Va. 571, 9 S. E. (2d) 454, 455:

" 'Whenever one sees another in a place of peril from

which it appears that he cannot extricate himself *or where it appears that he is unconscious of his danger, or whenever by the exercise of ordinary care the defendant should have been cognizant of the situation* and has a clear chance to avoid an accident with safety to himself, he must take that chance. *In short, he is charged with what he saw and with what he should have seen.* The antecedent negligence of a plaintiff does not of itself preclude his recovery. Starkly stated, the reason for the rule is this: One can not kill another merely because he is negligent.' " (Italics supplied).

That it was the duty of the engineer in this case to keep such a lookout as would enable him to see the decedent, Marshall, so long as he was within his range of vision, *and thereafter to observe the conductor, Mays, giving his stop-signal orders,* is established, I think, by our recent decision in *Washington, etc., Railroad* v. *Taylor,* 188 Va. 458, 50 S. E. (2d) 415. That case involved the liability of the railroad company for the death of a trespasser on its tracks, who had wandered there in an intoxicated condition and fallen asleep. Two young boys, who knew of this condition, sought to warn the engineer of the approaching train by waving their arms. In referring to the testimony of the engineer and other witnesses as to this incident, the opinion of Mr. Justice Gregory has this to say:

"He" (the engineer) "says that he saw Boldin waving his arms above his head. Boldin testified that he was between the rails flagging the train. As we have already stated, the jury could have accepted that statement. It constituted a superadded fact. From the testimony of both Boldin and Thompson the jury could have found that the engineer was not keeping a proper lookout ahead at the time the engine passed the boys. No whistle was sounded or bell rung to warn Boldin to get off the track though the train was approaching closely to him. The jury might have concluded that the engineer even failed to see Boldin from the fact that he failed to sound his whistle, and that he also failed to see Taylor."

In the *Taylor Case* the accident occurred at a point where pedestrians frequently made use of the railroad track. And so in this case there is ample evidence to show a similar pedestrian use of the area in the vicinity of the place where the accident occurred.

I will summarize my views as follows. I think the evidence is sufficient to support the following findings by the jury:

1. That just immediately prior to the time the engine started in motion, the decedent and Mrs. Black were standing opposite the warehouse door with their attention obviously fixed on what was taking place inside of the warehouse.

2. That the engineer, if he had kept a proper lookout, would have seen them in their situation of peril at the time his movement began and thereafter while his engine was traveling the first 79 feet, or thereabouts, in their direction.

3. That bell of the engine was not ringing.

4. That if the engineer had observed the decedent in an attitude showing that he was oblivious to the danger from the moving engine, and that his attention was absorbed by occurrences within the warehouse, it would have been his duty to stop the engine immediately, or to adopt other effective means to avoid killing the decedent.

5. That the defendant, through its agent the yard conductor who was in charge of the movement of the train, discovered at the time the engine began its movement, that the decedent was in a situation of peril and was in danger of injury or death unless the movement of the engine was halted, and gave signal orders to the engineer to halt such movement.

6. That if the engineer had kept such a lookout as it was his duty to do, he would have seen the conductor, Mays, as he was running towards him giving the stop signal orders.

7. That it was the duty of the engineer to obey such

orders of the conductor, if he had seen them, and immediately to stop the movement of his engine.

8. That the defendant, through its engineer, had the last clear chance to save the decedent by keeping a lookout through its servant, the engineer, and by his obeying the orders of the conductor.

9. That the engineer neither looked ahead before, or at the time, the genine started, nor kept any lookout whatever while the engine was in motion.

10. That, under the circumstances of this case, such failure of duty on the part of the engineer was the sole *proximate* cause of the decedent's death, and that the decedent's negligence, if any, was a remote cause.

After hearing the testimony of the witnesses and viewing with the jury the scene of the accident and the engine involved therein, the learned judge of the trial court entered judgment upon the verdict of the jury in favor of the plaintiff. I do not think we should disturb that judgment.

GREGORY, J., concurs in this dissent.