# Richmond

## Atlantic Coast Line Railroad Company v. Russell E. Clements, Administrator of the Estate of William Earl Clements.

January 14, 1946.

Record No. 2978.

Present, All the Justices.

The opinion states the case.

*J. M. Townsend* and *E. Ennis Eanes*, for the plaintiff in error.

*E. Peyton Turner* and *William Old*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This is an action by the administrator of William Earl Clements against the Atlantic Coast Line Railroad Company, hereinafter referred to. as the defendant, to recover damages for the alleged negligent killing of William Earl Clements, an infant seven years of age, by the railroad company at a street crossing in the town of Emporia, Virginia. There were a verdict and judgment for the plaintiff of $3,000. The railroad company assigns error.

The physical facts surrounding the scene of the collision and the evidence with reference to the accident are as follows:

The Meherrin River separates North Emporia from South Emporia, and the tracks of the railroad company cross the river and divide the town east and west. There are three grade crossings in North Emporia, namely, Atlantic Street just north of the railroad's freight station, Southampton Street south of its passenger station, and Virginia Avenue one hundred yards south of Southampton Street. The railroad company has a double track, the easterly track for northbound traffic and the westerly track for southbound traffic. Virginia Avenue crosses the tracks at right angles, and immediately thereafter bends southerly for a short distance, and connects with Park Avenue east of the crossing, the latter avenue running east and west. The right-of-way of the railroad company is eighty feet wide, and is on a level three and two-tenths feet above Virginia Avenue, a paved street. On its western side the incline from the street begins about thirty feet from the first rail of the northbound tracks.

Paralleling the railroad right-of-way on the west side of its tracks is Halifax Street connecting the three streets herein named. Between Halifax Street and the right-of-way, the only obstructions to sight are the freight and passenger stations mentioned, and a water plug or stand pipe about one hundred and forty feet from Virginia Avenue. The west side of Halifax Street is improved with buildings. The Meherrin River railroad bridge is seven hundred feet south of the Virginia Avenue crossing.

The crossings at Atlantic and Southampton Streets are protected by watchmen. There is no ordinance of the town requiring any protection at the Virginia Avenue crossing. The Atlantic Street crossing carries the traffic of a main State highway. Southampton Street is a short cut for those entering the State highway from the south. Virginia Avenue is used for local traffic, chiefly for those living on Park Avenue, a residential section, and carries much less traffic than the other crossings. An ordinance of the town allows all trains a maximum speed of forty-five miles per hour through the town. Another ordinance prohibits the sounding of any locomotive whistle within the town limits.

Photographs filed as exhibits show the views of one approaching the crossing on Virginia Avenue from the west. On the south side of Virginia Avenue, one hundred and ten feet west of the northbound track, is a dwelling house, the last building between that point and the tracks. When one passes this house, he has a clear view of the tracks for about seven hundred feet to the south. That view continues clear for a distance of forty feet easterly along Virginia Avenue. From that point it is partially obstructed in the summer-time by some trees in the backyard until within about eighteen feet of the southbound track or forty feet of the northbound track when a clear view of the tracks is again perceived.

On May 6, 1944, at about four-ten p. m., the plaintiff's decedent was riding as a passenger on the back seat of an automobile travelling east on Virginia Avenue. John Rook, a farmer and school bus driver, was driving the car, a Mercury sedan. He was thoroughly familiar with the

surroundings, using the crossing every day and parking his school bus within one hundred and fifty feet of the crossing daily when it was not in use. Beside him on the front seat was his wife. On the right side of the rear seat were Clarence Clements, next to him Johnnie Lee Rook, nine years old, next Mrs. Pearl Clements, and next to her, on the left, plaintiff's decedent. The automobile, while passing over the Virginia Avenue crossing, was struck on the northbound, or second track from the west, by a Diesel engine pulling sixty-five loaded freight cars. The automobile was pushed to a steam engine standing on the southbound track, where it was crushed between the two engines, and the occupants thrown out. All of the occupants of the car were killed except Clarence Clements, a youth seventeen years of age.

There were three eye-witnesses to the tragedy, and they describe what they saw and heard as follows:

The Rev. E. C. Thornton, Jr., a Baptist minister, was walking south on the west side of Halifax Street, and was about one hundred and twenty-five yards northwest of the crossing. He saw the automobile on Virginia Avenue about half-way across the intersection of Halifax Street, travelling, he estimated, at about fifteen or twenty miles per hour. He did not hear the train, but saw it when it came across the river bridge south of the crossing. He thought it was running about forty miles per hour. The automobile was then about forty feet from the center of the northbound tracks of the railroad. He saw a steam locomotive at the water plug on the southbound track about one hundred and forty feet north of the crossing. All he saw and heard happened in about five seconds, and he could not say whether, during that time, the automobile slowed down or not. He did not hear the bell of the Diesel engine ringing before the accident, but heard it ringing as it passed him after the collision.

J. D. Drake was the engineer on a steam engine which was taking water from the water plug on the southbound or west track. He had gotten down on the east side of his engine, walked in front of it, and was about one hundred and ten

feet north of the Virginia Avenue crossing, in the center of the southbound track, when he saw the Diesel engine come around a curve beyond the river more than nine hundred feet southerly. He heard the sound of its motors as it came closer. He looked to the west and saw the automobile approaching upon the crossing at about seven or eight miles per hour. It had just started up the incline at the crossing, "he looked like he was going to stop at the railroad track before getting on the track, * * * . I was sure he was going to stop, and I looked at the Diesel, the northbound freight train, to see the train pass, to see if there was anything wrong with the train. That is our duty to inspect the trains when going by. And, as he got to the street crossing, I happened to glance down there, and this Ford Mercury was on the northbound track and the Diesel hit it about the windshield on the right-hand side, and I saw it just also about the time of the impact; and I ran over towards the edge of the right-of-way on Halifax Street. And I heard the brakes go on in emergency." He did not know whether the automobile stopped or not. He was not paying attention to the ringing of the bell of the Diesel, and did not know whether it was ringing or not.

Drake said he was standing at a point where he had the same view of the approaching train that the driver of the automobile had, if the driver stopped where Clarence Clements said he stopped, and that there was nothing to obstruct the view of the driver of the car to the south when he drove on the crossing. This witness further testified that there was, perhaps, a little steam blowing from his locomotive, "but not enough to attract any attention,— nothing noticeable." He said there was "practically" no difference between the noise made by a steam engine and a Diesel engine, adding, "No more than the train rumbling along. There is a certain amount of noise from a train rolling along anywhere you see it. You can hear it. A man driving up to the track there, and who has his mind on what he is doing, is bound to hear a train coming."

S. A. White, a lineman of the Western Union Telegraph Company, was walking south on a railroad pass track, east of the main tracks, approaching Southampton Street which is about one hundred yards north of Virginia Avenue. He heard the Diesel engine blow "a long way off" and saw it come in sight around the curve south of the bridge over the Meherrin River before he saw the automobile approach the tracks. He paid no further attention to the train until he got close to Southampton Street, when he saw the automobile go up on the southbound track. He did not see the automobile stop. He thought it was running about fifteen miles per hour, and the train from thirty to forty miles per hour. He paid no attention to the bell of the train, and could not say whether it rang or not. He also said that there was no obstruction to the view of the driver of the automobile to the south.

J. R. Cole, the engineer, and W. W. Bryant, the fireman, on the Diesel engine sat at a window in front of the engine about fifteen feet above the ground. They could see the track in front of them, except for a space of about twenty-five feet ahead of the engine. They were looking ahead when Bryant, the fireman, saw engineer Drake jump back. The fireman stood up and saw the automobile "right in front" of his engine, about ten feet away, just as its front wheels reached the northbound track, and exclaimed "My God!" The engineer immediately put the brakes in emergency. This threw the power off the engine and applied the brakes. Both stated that the automatic air bell was started at a crossing before entering the town, and that it rang continuously until it was turned off by the engineer when the train stopped after the collision. Cole said the bell was standard equipment for his engine, and that it had "a plenty of sound to give a plenty of warning." The engineer said he looked at the speedometer when the train was at the bridge over the river, about seven hundred feet from the crossing, and it registered thirty-five miles per hour. The brakes of the train worked perfectly, and the train, in their opinion, made a good stop after the collision.

Clarence Clements, the seventeen-year-old youth, who sat on the right-hand side of the rear seat, was put on as a witness by the plaintiff. He had attended school about six years, reaching the fourth grade, and could write his name but could not read. He said that the automobile approached the crossing at a speed of about ten to fifteen miles per hour, and came to a complete stop about six or seven feet from the first track, the southbound track, that is, about twenty feet from the northbound track, for a period of from ten to fifteen seconds; that he heard no signal and did not see the train; that the windows of the automobile were all closed except the one at the driver's seat on his left; and that he saw Rook, the driver, turn his head towards the steam engine which was taking water to the north of the crossing; but did not see him look to the south.

Upon being recalled to the stand by the plaintiff, and his attention directed to a photographic exhibit, he positively located the point at which the automobile stopped before reaching the tracks, at a distance of about forty feet from the center of the northbound track.

Additional evidence will be stated in discussing the controlling questions involved.

The trial court held that there was no positive evidence that the bell of the Diesel engine was not ringing, and instructed the jury, without objection from the plaintiff, that it must be taken as a proven fact that the bell was ringing. *Chesapeake, etc., Ry. Co. v. Jacobs,* 166 Va. 11, 183 S. E. 221.

The court then submitted to the jury the questions, whether the ringing of the bell constituted adequate warning of the approach of the train, whether the railroad company should have furnished protection to travellers by watchmen, or otherwise at the Virginia Avenue crossing, and whether its negligence in either respect was a proximate and contributing cause of the accident.

There is no substantial conflict in the evidence. The negligence of the driver of the automobile is obvious; but the seven-year-old infant decedent was incapable of contributory negligence and the negligence of the driver

cannot be imputed to his infant passenger. And there is no presumption that the defendant was negligent because of the mere fact that its train struck the automobile in which the plaintiff's decedent was riding.

In order to justify a recovery by the plaintiff against the railroad company, the burden was on the plaintiff, first, to prove that the defendant was guilty of negligence in failing to give adequate, reasonable, and timely warning of the approach of its train to persons approaching the Virginia Avenue crossing, and, second, that such negligence was the proximate or contributing cause of the death of William Earl Clements.

This brings us to a consideration of the duty of the railroad company to travellers approaching and crossing Virginia Avenue.

The Virginia Avenue crossing is within the corporate limits of the town of Emporia, and, therefore, the railroad company was not required to give the crossing signals required by Virginia Code, 1942, (Michie) sections 3958 and 3959. *Norfolk, etc., Ry. Co.* v. *Wilkes' Adm'r,* 137 Va. 302, 119 S. E. 122; *Southern Ry. Co.* v. *Davis,* 152 Va. 548, 147 S. E. 228.

Since the town prohibited, by ordinance, the blowing of locomotive whistles within its limits, the only warning the engineer could give was the ringing of the bell of the engine. The inapplicability of Code, sections 3958 and 3959, and the absence of an ordinance under Code, section 3998, did not, however, relieve the railroad company from the common-law duty to give adequate, reasonable, and timely warning of the approach of its train to the grade crossing. *Franklin, etc., R. Co.* v. *Shoemaker,* 156 Va. 619, 159 S. E. 100; *Norfolk, etc., Ry. Co.* v. *Wilkes' Adm'r, supra; Southern Ry. Co.* v. *Bryant's Adm'r,* 95 Va. 212, 28 S. E. 183.

The evidence shows that the bell of the Diesel was standard engine equipment. As a part of the engine, it came under the provisions of the Federal Boiler Inspection Act of 1924, U. S. C. A., Title 45, section 23. *Hines* v. *Smith,*

275 F. 766. Its adequacy to give timely warning in this case was established by the evidence.

Engineer Cole, in addition to saying that the bell had "a plenty of sound to give a plenty of warning," said "It rings faster (than a steam locomotive bell) and makes a sufficient sound. I know it gives a plenty of warning ahead."

The witness, White, when asked whether one would have to strain to hear the bell, replied, "No, no, sir. They are plenty loud."

There is no contradiction of this evidence, nor any positive contradiction of the fact that the engine bell was duly rung. It is true some witnesses said they did not hear it ring; but the attention of these witnesses was diverted to the fast developing tragedy immediately in front of them, and in the excitement of the moment failed to hear its sound. No one testified that the sound of the bell constituted an insufficient warning of the approaching train. The jury, therefore, had no more right to speculate upon the insufficiency of its warning, in the absence of evidence of its inadequacy, than to disregard the fact of its ringing. Thus, there was no evidence of negligence with reference to the adequacy of the sound of the bell.

A town may, when its council determines it to be in the public interest, require a railroad company to erect and maintain a gate or keep a flagman stationed at any place where its tracks cross a street within its corporate limits. Virginia Code, 1942, (Michie) section 3998. There was not in evidence any ordinance of the town of Emporia requiring the maintenance of flagmen, gates, or other warning device at any crossing within its limits. Whether it is to be presumed that the protection given crossings at Atlantic Street and Southampton Street by watchmen was enforced under an ordinance (*Atlantic Coast Line R. Co.* v. *Tyler*, 124 Va. 484, 98 S. E. 641), or voluntarily given by the defendant, because it realized the hazardous conditions surrounding those two crossings, is immaterial here. In the absence of a statute or an ordinance, the protection required

at the Virginia Avenue crossing was a question of fact dependent upon the conditions existing there.

As stated, Atlantic Street is a part of a main State highway and Southampton Street is a short route for traffic entering the State highway from the south. Near each railroad crossing on these two streets are buildings, including the freight and passenger stations mentioned, which obstruct the view of travellers to approaching trains.

Virginia Avenue carries a much smaller amount of traffic than the above streets. It is used only for local traffic, chiefly for residents of Park Avenue, which avenue may be reached by other streets. There are no major obstructions to the view looking south on Virginia Avenue for a distance of one hundred feet west of the railroad crossing. The only minor obstructions are a telegraph pole and some small trees, at certain points, which hide only a portion of an approaching train. The view to the north is wholly unobstructed. At a point on Virginia Avenue forty feet west of the center of the northbound track, the view south was clear for more than seven hundred feet. In fact, at that point, it was a wide open crossing.

A witness for the plaintiff, H. J. Wendell, a deputy sheriff of Greensville county, when asked whether the crossing was dangerous, said "No, no more than any railroad crossing." The defendant's witness, Drake, testified that "This Virginia Avenue crossing is wide open both ways."

In *Norfolk, etc., Ry. Co.* v. *Wilkes' Adm'r, supra,* we said: "In the absence of a statute or ordinance requiring it, it is not negligence *per se* for a railroad company to fail to maintain gates or signals or to keep a watchman at grade crossings in small towns, unless the crossing is so unusually dangerous as plainly to require it."

In *Lawson* v. *Minneapolis, St. Paul, etc., Ry. Co.,* 174 Minn. 404, 219 N. W. 554, the court said:

"It is only where peculiar and unusual conditions render a crossing extra-hazardous that a railroad company can be charged with negligence in failing to protect it by gates or

other safeguards, unless the duty to provide such protection has been imposed by legislative authority."

See to the same effect *Batchelor* v. *Atlantic Coast Line R. Co.,* 196 N. C. 84, 144 S. E. 542, 60 A. L. R. 1091; *Opp* v. *Pryor,* 294 Ill. 538, 128 N. E. 580.

This rule has been applied by the courts generally. See also annotations and cases cited. 16 A. L. R. 1273; 60 A. L. R. 1096; 71 A. L. R. 1160; and 44 Am. Jur., Railroads, 767.

It is suggested in the argument that the presence of the steam locomotive one hundred and forty feet to the north of the crossing might have attracted Rook's attention, or that he might have been confused by the noise of the steam issuing from that engine. This is pure speculation, and there is positive evidence that there was no "noticeable noise" created by steam escaping from the locomotive. The presence of the locomotive to his north did not excuse the driver of the automobile from looking in both directions for approaching trains. Its presence on the track made it necessary for him to exercise a higher degree of care and caution before proceeding across the tracks.

There is no evidence that there were any peculiar and unusual conditions surrounding the Virginia Avenue crossing such as to render it unusually dangerous. Ordinary care on the part of a traveller affords both notice and protection. It was just an ordinary crossing. There was no congestion of traffic. There was an adequate view in both directions. There was absolutely no showing of such conditions as are ordinarily held to necessitate a flagman, the maintenance of a gate, or other signal devices.

As said in *Norfolk, etc., Ry. Co.* v. *Wilkes' Adm'r, supra,* the jury had no right, in the absence of evidence, to substitute its judgment for the opinion and judgment of the council of the town of Emporia, for the practical experience and judgment of the railroad company, and the positive evidence of witnesses.

We are forced to the conclusion that the sole proximate cause of the collision was the negligence of the driver of the automobile. He was familiar with the crossing

through daily use. He knew that it was not protected by watchmen, gates, or any signal device. And he must have known at what point he could stop and get the best view of the tracks to the north and south. The tracks themselves were a warning of danger to him. He evidently realized the danger because he stopped before crossing them. He stopped at a point where his vision was clear. It was his duty to look and listen for trains, and the fact that he stopped, for at least ten seconds, immediately before driving upon the tracks, created a strong presumption that he did so to look and listen—that being the object of stopping—and that he saw and heard, or ought to have seen and heard, what was both visible and audible to a normal person. Why he drove on the tracks in face of the onrushing train may never be known. He may have misjudged its speed or its distance from him, or temporarily lost control of his car or his judgment. The lamentable tragedy can only be classified as due to his complete failure to recognize and observe the due care and caution required of him, under the circumstances and conditions obtaining at the moment of his folly.

It is our duty to support a verdict when it is supported by the evidence; but it is equally true that it is our duty to set aside a verdict when it is plainly wrong or without evidence to support it.

There being no evidence upon which the jury could find the defendant guilty of any negligence, its verdict has no weight, and there is no necessity to discuss any other question. The judgment based upon the verdict is, therefore, plainly wrong. It is accordingly reversed, judgment entered here for the defendant, and the case dismissed.

*Reversed and final judgment.*