# Richmond

NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY V.
MARTHA JEAN FREEMAN.

May 7, 1951.

Record No. 3765.

Present, Eggleston, Spratley, Buchanan, Miller and Smith, JJ.

The opinion states the case.

*Willcox, Cooke & Willcox,* for the plaintiff in error.

*Ashburn, Agelasto & Sellers,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

The plaintiff, Martha Jean Freeman, 42 years old, was run over by a train operated by the defendant company and her right leg was severed at the hip. A jury awarded her $15,000 damages and the court below entered judgment on their verdict. The defendant asserts here that the evidence fails to establish that it was guilty of negligence which caused the injury; or, if it does, it shows that the plaintiff was guilty of contributory negligence.

The accident happened at a grade crossing in the city of South Norfolk where three sets of tracks of the railroad cross Avenue A. Avenue A appears on one of the maps to be 15 feet wide at the crossing and has no sidewalk. It runs approximately east and west, while the railroad tracks run north and south. The three tracks, proceeding northwardly from the defendant's Berkley yards, run practically parallel with each other across some intervening streets and then across Liberty street to and across Avenue A. After crossing Liberty street the middle track keeps straight ahead across Avenue A and on to the Norfolk & Western yards farther north; but the eastern, or right-hand track veers to the right and crosses Avenue A on a curve and about 40 feet to the east of the middle track. Avenue A is the first street north of Liberty street and about 340 feet from it.

There were no gates or warning devices at the Avenue A crossing and no ordinance of the city required any. The nearest light is a street light on the west side of the middle track about 65 feet from the east track.

On the night of, March 19, 1949, at about 7:30, according to plaintiff, but somewhat later according to other evidence, the plaintiff, who lived in the neighborhood and was familiar with the crossing, was walking west toward the crossing along the south side of Avenue A going home. As she approached the crossing her vision to the south, her left, was obstructed by buildings along the south side of the street and particularly by a frame residence at the southeastern corner, facing the avenue and with its side, in which were no windows, next to the east track. There was a low wire fence along the edge of the street in front of this building, the corner post of which was only 3.7 feet from the overhang of an ordinary boxcar on the east track. It was four feet four inches from the corner of the fence to the corner of the porch, five feet wide, which ran along the front of the house, and eight feet from the corner of the house to the side of such boxcar.

When the plaintiff got to the crossing a train consisting of an engine and 13 to 15 cars, referred to herein as the long train, was passing on the middle track going north, and just about the time it cleared the crossing another train, referred to herein as the short train, consisting of an engine and three cars, backed in the same direction over the crossing on the east track and struck the plaintiff as she was about to cross that track. Her evidence was that the engine on this train was facing south, backing and pushing this train; that there was no light on its rear end, which struck her, and no warning of its approach by bell or whistle; that before stepping toward the crossing she looked and listened, but neither heard nor saw the train and in the darkness of the crossing did not know of its presence until she was struck. She testified as follows:

When the accident happened, it was dark, "but it wasn't so dark;" she was walking up close to the fence; she saw the train on the middle track when she was two or three doors from the corner and heard its bell; she stopped at the corner of the fence waiting for that train to pass; the engine of that train was at its south end and backing and pushing the train, with its headlight shining south toward Liberty street; "when that train cleared the track, I stopped and looked both ways before I went to take a step. This train had no lights on it. As I went to take a step, a flatcar hit me. That car hit me on this side—it hit me on the left shoulder. * * * A flatcar hit me, with no lights. I was

trying to get away from this car, and, when that boxcar got to me, that was when it knocked me 'twixt the cars, and started dragging me, and that is the last thing I remember. * * * The next car to that flatcar was the boxcar. That just wound me right into it, and that is the last thing I remember."

On cross-examination she was asked if there was anything between Avenue A and Liberty street to keep her from seeing and she replied that you can see to Liberty street, but it was dark, there were no lights along there and you can't see any lights from Liberty street and "(w)hen I come up to the corner of this house and stopped and looked, by being dark, and looking at this other train with that light in my face, I did not see this train."

She was corroborated by her witness Robert Lee Moose, who testified that he was walking along the avenue about two doors behind the plaintiff when she was struck; that he had not recognized her because the street was rather dark; that another train was moving over the middle track so you could see the reflection of the light between the cars as they passed; that the engine on that train was on the south end backing and pushing the cars, with its headlight shining toward Liberty street; that when she got to the crossing he saw the train that hit her, only two or three seconds after the other train had passed; that he heard her hollo and it looked like it dragged her 15 or 20 feet; that the engine on this train was backing and pushing it so the cars came to the crossing first; that there were no lights on that end of the train; that the whistle was not blowing and the bell was not ringing; that as soon as the engine pulled by it threw its light on her and he saw her lying on the track; that he ran to her, saw who it was, but he thought she was dead and ran to tell her sister.

Henry Mitchell, another of her witnesses, testified that he and Herbert Collins met the plaintiff and spoke to her about the middle of the block as she was walking toward the crossing. He went into the house of his sister-in-law for a moment and as he came out and started toward the crossing the rear end of the long train had crossed the crossing and just then the short train came. He saw the plaintiff close to the track, right at the fence, right in front of the house, but he could not state whether she was then moving or standing still because "that street gets dark." When the first car of the short train crossed the street, "I missed seeing her then." He said that when they got to the track he heard somebody on the track groaning and he then ran over to his

brother's to telephone the police. His testimony was that the engine of the short train was at the rear facing south toward Liberty street, backing and pushing the cars, but the engine of the long train was pulling that train.

Police department records showed receipt of Mitchell's call, which was transmitted to two police officers in a patrol car who received it at approximately 8:45 p. m. These officers testified that they went to the scene and found the plaintiff lying on the track approximately 30 feet north of Avenue A, with her waist across the east rail. Her right leg was completely cut off at the hip. Her hat was lying approximately four feet north of the avenue and there was blood on the tracks at that point and blood and flesh and pieces of clothing along the rail to the point where she was lying. There was very little blood at the body. While they were there the engine of the train that struck her came back from delivering its cars and had to be flagged down to prevent its running over her. Its crew did not know that they had hit anybody. The officers found blood and flesh on the left rear wheels of the tender and on the brake rigging of the engine. They made no examination of the cars which had been left at the Norfolk Southern Railway yards half a mile to a mile away. There was evidence that the plaintiff cried out when she was struck.

The evidence for the defendant came from the rear brakeman on the long train, the engineer, conductor and fireman of the short train, its head and rear brakemen, and the superintendent of the defendant company who was supervising the movement of this and other trains in its Berkley yards where these two trains were made up. They testified that the engine of the long train, which was headed for the Norfolk & Western yards, was at the head of the train and pulling its cars; that the short train was composed of an engine with its tender and three cars, two of which were boxcars and the rear car a high coal hopper with doors underneath; that there was no flat car in the train; that the engine of this train was at the front of the train, backing and pulling the cars, so the tender of the engine would reach the crossing first; that the tender had a headlight at the back equivalent to the headlight at the front of the engine, which was on and burning, and that there was a red lantern hanging on the ladder of the tender; that the bell of the engine was ringing, as they approached the crossing, running at five to ten miles an

hour, and that it reached the crossing just as the long train had cleared it.

Nobody on the train saw the plaintiff or heard her or knew that anybody had been struck. All of the train crew were riding on the engine, the conductor and two brakemen on its deck, and only the engineer and fireman testified they were looking. The engineer explained that he was on the left side of the engine as the train was going, and on the outside of the curve, so that the headlight would shine off of the track. The fireman said he was on his seat, which would be on the right, as the train was moving, "sitting there looking out, and ringing the bell," which was a mechanical bell operated by air. He was asked where he first turned it on and replied, "We usually turn it on just before we cross Bainbridge Boulevard," which was south of Liberty street; that it was ringing continuously from the time they crossed the boulevard. He said he did not see the plaintiff at the crossing, although he was right above her when the wheels passed over her. No claim was made that the whistle was blown. The fireman said, "We don't have to blow a whistle going out of there." He said that the bell did not make too much noise but enough so you can hear it. "I can usually tell when it is ringing."

While the engineer testified that there was a red light hanging on the back of the tender, "to protect the rear of the train," he also testified that he did not see it until they stopped at the place of accident coming back from the South Norfolk yard. The superintendent testified that the lantern was for the convenience of the crew, required to be used only for a movement on the main running tracks and not for shifting in the yards or making short moves. The engineer testified that the bell was started just before they got to Liberty street, but he also said that before they got to Liberty street they had crossed Bainbridge boulevard. The conductor also said it was turned on when they entered Liberty street and after they had passed over two or three other streets after leaving Berkley yards.

It is obvious that the evidence is decidedly in conflict. It is the function of the jury, as the triers of the facts, to settle such conflicts. We might disagree with their conclusion, but it is theirs to make, and unless their verdict is plainly wrong or without credible evidence to support it, we are without warrant to

disturb it after it has been approved by the trial court. Code, 1950, § 8-491. *Virginia Elec., etc., Co.* v. *Blunt*, 158 Va. 421, 431, 163 S. E. 329, 331; *Virginia Stage Lines* v. *Duff*, 185 Va. 592, 595, 39 S. E. (2d) 634, 635.

The defendant contends that the plaintiff's testimony is incredible and the accident could not have happened as she said it did without violating the laws of physics. The jury might have said so under the evidence, but they said the contrary, and their conclusion is not without evidence to support it. As the jury could view it, she was not first struck where she was later found, nor was she run over where she was first struck. She was attempting to cross at the south edge of the street. Her hat and the first blood were found four feet from the north edge of the street. There were blood and flesh along the rail from that point to where she was lying. It was quite evident that she was knocked or dragged, or both, after she first came into contact with the train. Her evidence was that she was struck by the leading car, which she said was a flat car, as she was stepping forward, and it spun her around, causing her to fall into it again; whereupon she tried to push away from it again, was struck by a boxcar, fell between them and she remembered no more after it started dragging her.

It may not, of course, have happened just that way. She did not see the flat car, "just felt it." The frame of the hopper car, or even the platform of the tender could have given her the impression that it was a flat car that struck her. As was said by Mr. Justice Eggleston, in *Crew* v. *Nelson*, 188 Va. 108, 115, 49 S. E. (2d) 326, 329: "It is a matter of common knowledge that frequently a person's observation and recollection of swiftly moving events immediately preceding the crash in which he is severely injured are confused and distorted."

Whether this plaintiff's account of what happened to her after she was first struck was fact or fancy, the case made by her evidence was that she was struck by the defendant's train, which was backing over this crossing without lights and without warning, and clearly the jury had a right to say the defendant was negligent in so moving its train.

In the absence of applicable statute or city ordinance (Code, 1950, § 56-414), as was the case here, the defendant owed the plaintiff the common law duty of giving adequate, reasonable

and timely warning of the approach of its train to this crossing, and whether it did so was a question for the jury under the evidence. *Southern Ry. Co.* v. *Bryant*, 95 Va. 212, 214, 28 S. E. 183; *Davis* v. *McCall*, 133 Va. 487, 499, 113 S. E. 835, 840; *Franklin, etc., Ry Co.* v. *Shoemaker*, 156 Va. 619, 630, 159 S. E. 100, 104; *Southern Ry Co.* v. *Campbell*, 172 Va. 311, 316, 1 S. E. (2d) 255, 257; *Chesapeake, etc., R. Co.* v. *Folkes*, 179 Va. 60, 65, 18 S. E. (2d) 309, 310; *Atlantic Coast Line R. Co.* v. *Clements*, 184 Va. 656, 665, 36 S. E. (2d) 553, 557.

The defendant insists that even if that be true, yet the plaintiff should not have prevailed because her own negligence contributed to her injury. Contributory negligence of a plaintiff is failure to use reasonable care. Such failure is not presumed, but must be shown by the evidence. Depending as it does upon the facts of the case, it is usually a jury question, and is to be decided by the court only when reasonable men should not differ as to what facts are proved and as to the proper inferences from the facts proved. *Hoover* v. *Neff*, 183 Va. 56, 62, 31 S. E. (2d) 265, 268.

It was the duty of the plaintiff to look and listen with reasonable care; not an absolute duty to discover the presence of the train, unless by so looking and listening she was bound to have discovered it. *Oliver* v. *Forsyth*, 190 Va. 710, 716, 58 S. E. (2d) 49, 51. Reasonable care requires that the looking and listening be done where it would reasonably be expected to be effective. *Norfolk, etc., R. Co.* v. *Eley,* 157 Va. 568, 573, 162 S. E. 3, 4; *Virginian Ry. Co.* v. *Rodgers,* 170 Va. 581, 587, 197 S. E. 476, 478.

As was said in *Kimball & Fink* v. *Friend*, 95 Va. 125, 138, 27 S. E. 901, 903, the fact that the plaintiff got into a position in which she could not escape a collision, is not conclusive evidence that she was there by her own negligence. She may have been there by the defendant's negligence. Whether she used due care depended upon inferences from facts to be found by the jury, including the manner in which she approached the track, the darkness of the crossing, the obstructions to her view, how the negligence of the defendant affected her conduct, and other circumstances and conditions surrounding her attempt to cross the track. In that case the traveler was on a bicycle. The approach to the track was over a narrow road running through a cut, extending to within a few feet of the track. The track in the direction from which the train came was visible at several points be-

fore the cut was reached and at varying distances when through it and close to the track, including a view for 700 feet at a distance of 9½ feet from the rail. There was an electric gong on the opposite side of the crossing but there was evidence it was not ringing and that no warning was given by bell or whistle. The evidence was that the traveler who was killed did not stop and there was none as to whether he looked or listened. It was held that there was a presumption, though slight, that he did his duty and that under the facts and circumstances his negligence was a question for the jury. See also, *Southern Ry. Co.* v. *Bryant, supra,* 95 Va. at p. 219, 28 S. E. at p. 185; *Chapman* v. *Hines,* 134 Va. 274, 281 ff, 115 S. E. 373; *Southern Ry. Co.* v. *Aldridge,* 101 Va. 142, 149, 43 S. E. 333, 335; *Southern Ry. Co.* v. *Campbell, supra,* 172 Va. at pp. 318 ff, 1 S. E. (2d) at pp. 258 ff.

Here the plaintiff testified that just before she stepped toward the track she stopped at the corner of the fence, a place where she could have seen and heard, but she saw no train approaching and heard no bell or whistle warning of its approach. There was some corroboration from her other evidence. Nobody testified to the contrary. Her evidence was accepted by the jury, and for us to decide as a matter of law that she did not look and listen, we must say that reasonable men could not decide otherwise than that if she had looked and listened she would have discovered the approaching train.

The evidence, as the jury could have taken it, was that she had no view of the track as she walked along Avenue A in the dark until she passed the corner of the house, which was only eight feet from the overhang of the train, with the corner of the fence at which she stopped only 3.7 feet away; that the crossing was unlighted except by the street light on the far side of the middle track, on which the long train was passing; that the headlight on that train was shining in her eyes and as she turned from it there was no light to her left toward Liberty street; that as the long train passed over the crossing the noise from it would interfere with her hearing the approach of the short train immediately following on the track near her; and out of the darkness to her left came the short train, backing without a light on the end that struck her and with no bell or whistle to give warning of its approach. To these elements may be added the statement of the fireman that he did not see the plaintiff under the conditions there existing, although he was looking from his

position right above her when the train passed over her. We think it was for the jury to say whether the plaintiff was guilty of contributory negligence.

The solution of the question must depend on the facts in each case and the answers differ as the facts differ. In *Chesapeake, etc., R. Co.* v. *Barlow,* 155 Va. 863, 156 S. E. 397; *Norfolk, etc., R. Co.* v. *Eley, supra,* and *Atlantic Coast Line R. Co.* v. *Clements, supra,* cases relied on by the defendant, contributory negligence was determined to exist as a matter of law because the facts of those cases were such that if the duty of looking and listening had been observed, the presence of the trains was bound to have been discovered.

The remaining assignment of error is to the refusal to give defendant's Instruction D-8, which would have told the jury that they must not find for the plaintiff unless they believed that the defendant failed to use reasonable care to keep a lookout for persons on the crossing, or to blow its whistles, or to ring its bell, or to have the leading end of its train equipped with a light, and that such failure proximately caused or contributed to the accident.

It was not error we think to refuse it. Two other instructions given for the defendant told the jury that they must not find for the plaintiff unless she proved by a preponderance of the evidence that the defendant was guilty of negligence as alleged in the notice of motion for judgment. The instruction refused was peremptory and should have been exact in stating what the plaintiff was required to prove. Instead, it would have told the jury, in effect, that the defendant's duty of lookout was for persons on the crossing, while plaintiff testified she was not on the crossing but stepping toward it when struck. It made no reference to the fact that blowing the whistle or ringing the bell must have been done so as to furnish timely as well as adequate warning; nor was it accurate to say that the defendant's duty was to equip the leading end of its train with a light without reference to the sufficiency of it to give warning.

The judgment below is

*Affirmed.*