### Richmond

## NORFOLK AND WESTERN RAILWAY COMPANY
## v. LUCY M. GREENFIELD,

Administratrix, etc.

June 9, 1978

Record No. 770258

Present: All the Justices.

*Glenn M. Hodge; W.W. Wharton (Wharton, Aldhizer & Weaver,* on brief) for plaintiff in error.

*Flournoy L. Largent, Jr. (Edward F. Greco; Largent, Anderson, Larrick & Groves,* on brief) for defendant in error.

COMPTON, J., delivered the opinion of the Court.

On July 30, 1974, Charles Wilbur Greenfield was killed when the 1963 Ford station wagon he was operating was struck by a Norfolk and Western Railway Company train at a rural railroad crossing in Warren County. In this death by wrongful act suit instituted against N & W by Greenfield's administratrix, the court below, overruling post-trial motions, entered judgment on a $350,000 jury verdict in favor of the plaintiff.

To the November 1976 final order, we granted the railroad's petition for a writ of error, which raised a number of issues. In the view we take of the case, however, we will address only whether there was sufficient evidence to create a jury issue that the statutory train signals were not given and whether the plaintiff's decedent was guilty of contributory negligence as a matter of law.

The undisputed facts will be viewed, of course, in the light most favorable to the plaintiff, who is armed with the verdict of a jury approved by the trial judge. The accident occurred at the community of Success where State Route 661, a gravel road running east and west, was crossed at right angles and at the same level by a single north-south track of the railroad. The motor vehicle was eastbound, the train northbound. The time was 6:35 a.m. The weather was foggy.

There were no electrical or automatically operated protection devices installed at this public crossing. On the road just east of the track was a crossbuck warning sign with the inscription "railroad crossing" facing both east and west.

In the immediate area of the crossing, the track ran in a slight "cut", that is, the terrain adjacent to the railroad right-of-way was at a level above the bed of the track. At the time, within 100 feet south of the crossing, and west of the track, there was "some foliage" and shrubbery on the fenced right-of-way, which was 66 feet wide. Viewing the photographs introduced in evidence, the height of that growth was approximately two feet. Also within 100

feet of the crossing, and west of the rails, two trees were "setting up next to the fence . . . between the fence and the railroad tracks." The trunk of one tree, however, according to the testimony, was approximately six feet from the track, with the foliage of that tree beginning about 12 feet above the ground. The distance south of the crossing of these two trees is not precisely fixed by the testimony, except that one was described to be "on the corner", presumably the southwest corner of the intersection. The photographs show such a tree near the west fence line and just south of the road, but its trunk is located at a much greater distance than six feet from the track.

Greenfield, a 30-year-old sheet metal worker, left his home ten minutes before the accident on the way to his place of employment in Fairfax. According to his widow's testimony, he had traveled this same route to and from his place of work during an earlier two-year period when he was working in Front Royal. His wife variously described the weather that day as being "a little foggy", "pretty foggy" and "a heavy fog," at the time he left home.

As Greenfield drove toward the crossing, the train had been traveling from Front Royal in "patchy fog". It consisted of three diesel engines and 44 freight cars; it was 2,500 feet long and weighed approximately 2,842 tons. The engineer was sitting in the lead engine on the right side about 12 feet from the front of the train. The brakeman was sitting in a corresponding position on the left of the engine.

As the northbound train reached the top of a hill approximately 2,300 feet south of the crossing, it began descending a long grade which stretched to the crossing. The percentage of grade is not shown by the evidence. At that time the train's speed was 40 miles per hour with the engineer endeavoring to maintain the speed below a 50-mile-per-hour limit established for that area by the railroad. The engine's headlight, affixed 11 feet above the rails, was burning. The total height of the engine was approximately 12 feet.

The train's engineer and brakeman both testified that a bell and whistle (actually an air horn) were activated by the engineer as the train reached a whistle board, located 1,400 feet south of the crossing. According to the engineer, from that point to the crossing, he gave a continuous whistle signal comprised of "two longs, a short, and a long." He said that the bell was likewise sounded

continuously during that same distance, the ringing of the bell being started by pushing "over" a lever which "stays over until you manually push it back off."

The train continued toward the crossing at 40 miles per hour, having run into a fog bank which extended from a point 600 feet south of the whistle board all the way to the crossing. The "first indication" to the engineer of "trouble" was when the "brakeman put the train in emergency." The engineer never saw Greenfield's vehicle.

The brakeman testified that from his vantage point on the left of the train he could see ahead about 50 to 75 feet as the train approached the crossing. He stated that the weather was "foggy and you couldn't see very good." He further testified that when the train, still traveling at 40 miles per hour, was 75 feet from the crossing he first observed the station wagon as it became visible in the train's headlight. The vehicle was then moving toward the track about 18 feet west of the rails at a speed not revealed by the evidence. The brakeman related that he immediately "throwed the train in emergency". The evidence showed that ordinarily eight or nine seconds elapse before the emergency mechanism takes effect to accomplish any slowing of the train. The brakeman testified that when the train reached the crossing, the vehicle was still moving into its path, and the collision occurred.

The investigating police officer arrived on the scene shortly after the accident and found the station wagon 1,700 feet north of the crossing impaled on the front of the lead engine. The vehicle had been struck on its right side "at approximately where the door and the right front fender meet." The officer testified that during the course of his investigation, and after the fog had cleared, he examined the sight distance from the crossing along the track. From his position in his vehicle, which was stopped near the track with enough clearance "so as not to be struck by a train," the officer stated he could then see "approximately half a mile" in a southerly direction.

Hilton Grubbs, who was in bed in his home located on the southwest corner at the crossing, testified that:

"I heard the whistle blow and I heard it move across the crossing, that's all I heard."

He stated that he did not know at what point the whistle commenced sounding. When asked whether the train was making any

other noise, Grubbs answered that "[i]t always makes a noise when it goes by there, picking up slack and so forth", explaining:

> "Down below my place is all going downgrade. When they get along about my place, well then naturally they're taking up slack and the train is jerking and snapping and you can't tell when it hits anything. It all sounds alike."

The witness John Tennett, a high school sophomore, lived in a house located at the northeast corner of the crossing. He had been sleeping on a living room couch on the first floor of his home near a window facing south. He had awakened "about 5:30 or 6:00" and was lying on the couch when he "heard the whistle." The following colloquy occurred during his direct examination by the plaintiff:

"Q.  You heard the whistle of the train?

"A.  Yes.

"Q.  And what did you do when you heard the whistle?

"A.  Sat up on the couch and looked out the window.

\*     \*     \*

"Q.  And what did you see when you looked out the window?

"A.  I seen the light.

"Q.  What were the weather conditions that morning?

"A.  Foggy.

"Q.  And what was the condition of the light that you saw as far as . .

"A.  It was dim.

\*     \*     \*

"Q.  And what estimate did you make as to how far away the train was when you saw it, when you looked at it?

"A.  About two football fields, about two hundred yards.

\*     \*     \*

"Q.  Now, what did you do after you heard the whistle, you looked out the window, and - first of all, let me ask you, how do you arrive at two hundred yards as being the place where you saw the train?

"A.  It was from the house.

"Q. From what?

"A. From the house.

"Q. You estimated that distance from the house?

"A. Yes.

\*    \*    \*

"Q. Now, when you heard the whistle of the train, how soon after you heard the whistle did you look out the window?

"A. When the whistle blew.

"Q. When the whistle blew you looked out the window?

"A. Yes."

The exact distance of the house north of the crossing is not disclosed by the testimony. The photographs, however, show sizable yard area between the north edge of the road and the home.

The following testimony was elicted from Tennett on cross-examination:

"Q. Could these lights have been up as far as the trees at the top of the hill?

"A. Yes.

"Q. It could have been?

"A. Yes.

\*    \*    \*

"Q. That's a distance of considerably more than two hundred yards, isn't it?

"A. Yes.

"Q. So you were just more or less guessing at the distance, is that right?

"A. Yes sir."

Among its contentions, the r̶ ̶ ̶d argues there was no evidence that the statutory signals ̶ ̶ ̶ not given. Furthermore, and while denying that it was guilty ̶ any primary negligence, the railroad maintains that the plain ̶ evidence shows, as a matter of law, that the decedent was c̶ ̶butorily negligent.

The plaintiff responds that the railroad was negligent in at least four particulars. First, she argues there was credible evidence that the trainmen failed to give the statutory signals. Code § 56-414 provides that, under the circumstances of this case, the whistle shall be sharply sounded at least twice at a distance of not less than 300 yards nor more than 600 yards from the crossing and that the bell shall be rung or whistle sounded continuously or alternatively until the engine has reached the crossing. If the employees in charge of any train fail to give the signals required by § 56-414, the rule of comparative negligence applies, and any failure to exercise due care by the traveler in approaching the crossing will be considered only in mitigation of damages. Code § 56-416. Relying principally on the testimony of the witnesses Tennett and Grubbs, plaintiff contends there was "positive testimony that the train was within 200 yards of the crossing when the whistle [first] blew" and thus this issue was properly submitted to the jury.

Second, plaintiff argues that N & W violated Code § 56-411, which requires the railroad to clear from its right-of-way trees and brush for 100 feet on each side of a public road crossing at grade when such trees or brush would obstruct the view of approaching trains. Third, plaintiff contends that the train was being operated at an unreasonable rate of speed under the existing conditions, that is, at 40 miles per hour, downgrade, in fog, toward a crossing. Lastly, plaintiff urges that the engineer and brakeman were negligent in failing to keep a proper lookout.

In addition, observing that the burden of showing contributory negligence was on the railroad, plaintiff contends that the issue of the decedent's negligence was for the jury. Plaintiff argues that the jury could "reasonably infer from the evidence that the trees and brush obstructed the view of the decedent of the approaching train; that the decedent's view of the train's light was obscured by the foliage of the trees; that the railroad failed to give the statutory signals and the decedent was misled by the railroad's negligence; and therefore, not guilty of contributory negligence."

██ We will accept part of plaintiff's argument and assume without deciding that jury issues were raised as to whether the railroad was guilty of negligence which proximately caused the accident for obstructing the view along the right-of-way with brush and trees, for operating the train at an unreasonable speed, and for failing to maintain a proper lookout. But we cannot accept the balance of plaintiff's argument. We think there was insufficient

evidence to create a jury issue on the statutory signal question and that the contributory negligence issue was a question of law for the court.

The signal statute, first, requires warnings to be sounded (in a particular way) and, next, specifies the distance from the crossing within which the signals are to be activated. As to the first prong of the statute, there was positive, unequivocal, and credible testimony by the train crewmen that the required signals were given. That fact was confirmed by the plaintiff's witnesses Grubbs and Tennett. Grubbs said that he heard the whistle blow and heard the train move over the crossing. Tennett likewise heard the whistle. Unlike most cases of this kind, there was absolutely no testimony that the whistle and bell were not sounded. Hence, there was no conflict for the jury to resolve upon that question.

But was an issue of fact created as to the statutory requirement that the signals must be given not less than 300 yards nor more than 600 yards from the crossing? As to that fact, again both crewmen affirmatively testified that the signals were commenced about 467 yards (1,400 feet) from the crossing and sounded continuously until the accident. To be considered with that evidence are the statements of Grubbs and Tennett relating to that issue. The plaintiff contends the effect of those two witnesses' testimony is that the signals were not sounded until the train was less than the minimum statutory distance from the crossing, thus creating a conflict in the evidence on that fact. We do not agree.

This aspect of the case requires consideration of the legal effect to be accorded positive evidence on one hand versus negative evidence on the other. Entrenched in our law is the evidentiary principle that the positive testimony of a single witness, whose credibility is unimpeached, that he saw or heard a particular thing at a specified time and place, ordinarily outweighs, as a matter of law, the testimony of any number of equally credible witnesses who, with the same opportunities, state that they did not see or hear it. *Southern Railway* v. *Bryant's Adm'r*, 95 Va. 212, 215-16, 28 S.E. 183, 183-84 (1897). *See Southern Railway* v. *Barden*, 200 Va. 98, 102-03, 104 S.E.2d 13, 16 (1958). Mere bare negative testimony is entitled to no weight in the presence of affirmative evidence to the contrary. *White* v. *Southern Railway*, 151 Va. 302, 314, 144 S.E. 424, 427 (1928). But if there is evidence that the one who denies the fact had good opportunity to see or hear, and the evidence demonstrates that he probably would have seen or heard the event

if it had occurred, or it is shown that his attention was drawn to the matter controverted, then such testimony constitutes positive testimony, and produces a conflict of evidence to be decided by the trier of fact. *National Union Fire Insurance Co.* v. *Bruce,* 208 Va. 595, 598, 159 S.E.2d 815, 818 (1968).

Measured against the crewmen's affirmative testimony, Grubbs' asssertion that: "I heard the whistle blow and I heard it move across the crossing, . . ." taken with his statement that he did not know where the whistle began to sound, is insufficient to create a jury issue that the whistle was sounded for the first time less than 300 yards from the crossing. Actually, Grubbs' evidence does not even rise to the dignity of negative testimony—it is merely silent on the subject of where the signal commenced.

And the evidence of the other witness is only slightly stronger for the plaintiff. Analyzing Tennett's testimony, he never actually stated that the *first time* he heard the signal the train was within 200 yards of the crossing nor did he say that because he did not hear the signal earlier, it was sounded for the first time when the engine was less than 200 yards from the crossing. He merely said that after he heard the signal, he looked and saw the train within 200 yards of the crossing. At the most from the plaintiff's standpoint, reasonably to be inferred from his testimony is that the witness did not hear the signal sounded at a time when the engine was traveling within the area of not less than 300 yards nor more than 600 yards south of the crosssing. From that factual premise the plaintiff seeks to support the conclusion that the signal was not given within the required distance and the statute was thus violated. But this is pure negative testimony at best. It does not become positive testimony for the reason there is no showing that Tennett had a good opportunity to have heard a signal blown within the required area or that he probably would have heard the signal if it had been sounded within the statutory distance. Moreover, there was no showing that his attention was drawn to the event in time for him to have ascertained whether or not the signal was given at the proper place. Tennett was lying on a sofa near a south window of his home in the early morning hours of a foggy day. The record fails to disclose whether the window was open or closed. If open, he had a greater opportunity to hear a signal when it was first sounded. Furthermore, the witness was, of course, not expecting an accident to occur and there was no reason for his attention to be focused on the place where the signal of an

approaching train was first given. Raising this testimony as high as possible on the scale of probative value still does not convert this negative testimony to positive affirmative evidence such as to create a factual conflict.

Summarizing and paraphrasing *White, supra,* we hold that the testimony of witnesses that they failed to hear the bell or whistle of a railroad engine sounded within the required distance as it approached a crossing, without proof that the witnesses listened for the signal, or that their attention was in any way directed to it, or that they probably would have heard it if it did sound within the specified area, cannot prevail against the positive testimony of other credible witnesses that the signal was sounded at the required location. Thus, against positive affirmative evidence, by credible witnesses, that warning of the approach of a train to a highway crossing was given within the proper distance by ringing of the bell or the blowing of the whistle, there must be something more than the testimony of witnesses who by reason of their surroundings would be unlikely to notice the distance within which the warning was first given, in order to justify submission to the jury of the statutory signal question. 151 Va. at 313, 144 S.E. at 427. According plaintiff the benefit of the most liberal construction of this evidence, the most that can be said is that there is a scintilla of quasi-positive evidence tending to show that the statutory signals were not sounded as required. But a scintilla is not enough. Consequently, the plaintiff has failed to carry the burden of showing by a preponderance of the evidence that the signals were not given within the specified statutory distance. *Anderson* v. *Clinchfield Railroad,* 171 Va. 87, 93, 198 S.E. 478, 481 (1938).

We now turn to the issue of contributory negligence. The burden of showing that the deceased failed to exercise reasonable care in approaching the crossing and driving onto the track was, of course, on the railroad, unless such failure was disclosed from the plaintiff's own evidence or could be fairly inferred from all the circumstances of the case. As he approached the crossing, Greenfield had the duty to look and listen with reasonable care; he did not have the absolute duty to discover the presence of the train, unless by so looking and listening he was bound to have discovered it. *Norfolk and Portsmouth Belt Line Railroad* v. *Freeman,* 192 Va. 400, 408, 64 S.E.2d 732, 736 (1951). But even according the decedent the benefit of the "presumption, though slight," *id.,* 192 Va. at 409, 64 S.E.2d at 737, that he exercised due caution for his

own safety, we think the only inference supported by the evidence is that Greenfield failed to look and listen with reasonable care and thereby was negligent as a matter of law, which negligence proximately contributed to his untimely death.

The decedent was familiar with the crossing, having traveled over it on many occasions during a two-year period before the accident. He thus knew that he would have to rely on his senses of sight and hearing to notice for himself an approaching train, there being no automatically operated warning devices in place to remind him. He was cognizant of the foggy weather conditions on that morning; he knew, or should have known, as did the trainmen, that visibility at the scene was limited to, at most, 75 feet. Yet in spite of this knowledge of the cirumstances existing at the crossing, Greenfield drove his vehicle steadily into the path of an oncoming train which had its headlight burning, which, as we have already said, was sounding continuous signals, and which was otherwise making so much noise "taking up slack" and "jerking and slapping" that a witness could not distinguish the sound of this severe collision from the racket made by the train. At any time within the 18-foot distance traveled between the instant he was observed by the brakeman and before he crossed the rails, Greenfield could have stopped his vehicle, looked, and listened. Had he done so, he was bound to have seen the engine and headlight because, from that position close to the track, his view to the south was unobstructed. Also he was bound to have heard the train, even assuming all the windows were closed in his motor vehicle. (A photograph taken immediately after the accident shows that the window on the driver's side of the station wagon was partly open.) As we have said many times, the greater the danger at a particular crossing, the greater the vigilance which is required by the public highway traveler. The conditions existing at this location on the day in question demanded this increased measure of care on the part of the deceased which he utterly failed to discharge. The "slight" presumption of due care has been dissipated by clear evidence of negligence.

The plaintiff relies on a number of cases to sustain her position on the contributory negligence issue. All are distinguishable on their facts. For example, she relies, as did the trial court, on *Kimball & Fink* v. *Friend's Adm'r*, 95 Va. 125, 27 S.E. 901 (1897), in which the issue of the contributory negligence of the plaintiff's decedent was held to be a jury question. But that accident occurred

in the corporate limits of a city. The decedent was riding a bicycle. The court held that the traveler was lulled into a false sense of security as he approached the crossing because the gong placed there by the railroad to warn of approaching trains did not sound. Also no other notice was given of the approaching engine either by the blowing of a whistle or the ringing of a bell. A mere statement of the foregoing facts suffices to differentiate that case from this.

For the reasons stated, the judgment of the court below will be reversed, the verdict will be set aside and final judgment will be entered here for the railroad.

*Reversed and final judgment.*